THE ADMIRAL.

1. A case in prize, carried by appeal from a District Court into a Circuit
   Court, before the statute of March 3, 1863, allowing appeals in prize
   directly from the District Courts to this ·court, is properly here on
   appeal from the Circuit Court.
2. A vessel setting sail from England on the 9th September, 1861, with
   actual knowledge of a proclamation which the President of the United

States made on the 19th of the April preceding,—that is to say, made nearly five months previously,—declaring that certain of our Southern States were in insurrection, and that a blockade would be established of their ports,—had no right, under an allegation of a purpose to see if the blockade existed, to sail up to one of those ports actually blockaded.

3. The declaration in the President's proclamation of the date just mentioned, that if a vessel, with a view to violate the blockade, should approach or attempt to leave either of the said ports, she would be "duly *warned* by the commander of the blockading vessels, who would indorse on her registry the fact and date of such warning;" and that if the same vessel "shall *again* attempt to enter or leave the blockaded port she will be captured," does not apply to such a case; but the vessel is liable without any previous warning.

4. Mere sailing for a blockaded port is not an offence; but where the vessel has a knowledge of the blockade, and sails for the blockaded port with the intention of violating it, she is clearly liable to capture.

5. Where, during our civil war, the clearance of a vessel expressed a neutral port to be her sole port of destination, but the facts showed that her primary purpose was to get cargoes into and out of a port under blockade,—the outward cargo, if got, to go to the neutral port named as the one cleared for,—the fact that the vessel's letter of instructions directed the master to call off the blockaded port, and, if he should find the blockade still in force, to get the officer in command of the blockading ship to indorse on the ship's register that she had been warned off (in accordance with what it was asserted by the owners of the vessel was their understanding of neutral rights under the President's proclamation above mentioned), and *then* to go to the port for which this clearance called—will not save the vessel from condemnation as prize in a case where she has been captured close by the blockaded port, standing in for it and without ever having made an inquiry anywhere whether the port was blockaded or not. Presumption of innocent purpose is negatived in such a case.

ON the 19th April, 1861—seven days after Fort Sumter was fired on, and near the beginning, therefore, of our late civil war—the President of the United States issued a proclamation, by which he declared that an insurrection existed in certain of the Southern States, and that he deemed it advisable "to set on foot a blockade of the ports within the said States." "For this purpose," the proclamation proceeded, "a competent force *will* be posted so as to prevent entrance and exit of vessels from the ports aforesaid." "If, therefore," the document continued, "with a view to violate such blockade, a vessel shall approach, or shall attempt to

leave either of the said ports, *she will be duly warned by the commander of one of the blockading vessels, who will indorse on her registry the fact and date of such warning;* and if the same vessel shall *again* attempt to enter or leave the blockaded port, she will be captured and sent to the nearest convenient port, for such proceedings against her and her cargo as may be deemed advisable."

Among the ports included with the proclamation was the port of Savannah, Georgia.

On the 9th September, 1861—that is to say, *five months after the proclamation was published*, and the English having knowledge of it—the British ship Admiral was chartered at Liverpool by the firm of W. & R. Wright, of the British province of New Brunswick, to proceed with a cargo of salt " off the port of Savannah, and, if the blockade is raised, then to proceed into port, and deliver the salt according to her bill of lading; and if the blockade be *not* raised, then the ship to proceed to St. Johns, New Brunswick, and there deliver the same, with the usual despatch of the port." The stipulated freight was thirty shillings per ton, if the cargo should be landed at *Savannah*, and fifteen shillings per ton, if landed at *St. John's*.

The owners' *letter of instructions* to the master, inclosing the charter-party, and referring to our civil war, ran thus:

" The inclosed charter with the Messrs. Wright will show you nature of the voyage. These gentlemen, like many others, hold the opinion that this unfortunate contest cannot last long, it being so obviously the interest of both parties to bring it to a close. This being so, and their being very wishful to have a cargo of pitch-pine from Savannah to St. John, so soon as the port is again opened, is our great reason for their making it a condition in taking the ship, that she should go off Savannah, so that, if possible, they might have the very first shipment of timber. Of course, in calling off, you will endeavor to meet the blockading ship (if the blockade is found to exist still), and then get the officer in command to indorse on your register that the ship has been warned off. This will be all that is necessary for us, as owners of the ship, to justify your departure for St.

John's, and there consigning the ship to the Messrs. Wright, to whom, in the meantime, we will write respecting you.

"*You will distinctly understand, therefore, that you run no risk whatever with the ship, but rather endeavor to satisfy yourself as to the blockade, and then find out the man-of-war, report yourself, and get the register indorsed.* You will, no doubt, speak some vessels when approaching the American coast, so as to ascertain exactly the state of matters, *and be guided thereby in such way as not to infringe the blockade regulation.*"

Under this charter-party and this letter of instructions, the Admiral sailed from Liverpool, upon a direct course for Savannah, on the 12th of September, 1861. *Her certificate of clearance on board expressed St. John's, New Brunswick, as the sole port of her destination.*

On the 11th December, 1861, when about thirty miles off Tybee Island—an island that lies near the entrance to Savannah—the vessel was boarded by a ship of the blockading squadron. At this time she was standing directly for the port of Savannah, the same being then under efficient blockade, and the boarded vessel having made no inquiry anywhere, after leaving Liverpool, as to whether the blockade existed. At this time *Port Royal*, one of the ports of the Southern coast, and some distance above Savannah, was in our possession, having been taken by our squadron on the 7th of November preceding. This fact, however, was not known to those aboard the Admiral. When hailed, she made no resistance. On being boarded she produced her clearance for St. John's (which was more than a thousand miles from the place she then was), along with her letter of instructions; and professed that, in coming to the region in which she was, her purpose was to ascertain whether the blockade was raised, as she supposed when leaving England that it would be; numerous predictions to that effect having been made before she left England, as also confident assertions that the Federal Government would find it impossible to blockade effectively the Southern coast, three thousand miles in length. She declared her readiness, on having a notice and warning indorsed on her registry—as the procla-

mation of the President contemplated that, in such a case as hers, notice and warning should be indorsed—to proceed to St. John's, in accordance with what her letter of instructions contemplated she should do, if she found the blockade existing, and had "notice" and "warning" indorsed accordingly.

This was not satisfactory to the blockading officers, and the vessel was brought in to Philadelphia, and proceeded on, with her cargo, in the District Court there, for prize. The vessel was claimed by a certain Fernie & Co., of Liverpool, England, and the cargo by W. & R. Wright, already mentioned as of St. John's, all the claimants being British subjects.

The District Court restored the cargo but condemned the vessel. From this condemnation Fernie & Co., her claimants, appealed to the Circuit Court;—Congress not having as yet required, as it did by the statute of 3d March, 1863, afterwards passed, that appeals in prize causes to this court should be made directly from the District Court.

In the court below it was argued in behalf of the claimants of the cargo, that the papers fully set out the voyage and intent of the parties; that the captain's conduct, when captured, was frank; no resistance, no attempt to falsify, and no suppression. That to ascertain what the intent was the case was to be tried and the conduct of the parties judged by the state of things in September, 1861; that the proclamation of the President did not say that the ports *were* blockaded, but that they *would* be; that this was all in the *beginning* of the rebellion; that it was then again and again declared that, within a short time, at farthest, the blockade would cease. Port Royal, as the event proved, had come to be in our possession at the time. It might as well, nearly, have been Savannah; but, as it was, events showed that—giving " days of grace" proportioned to the matter—allowing the margin proper—not holding parties too much *au pied de la lettre*—there was perhaps no such misconception, after all, by those who predicted, as eminent persons in our country notoriously did, that the rebellion would be an affair of sixty days, and that the Southern ports would soon be open. Neither was the English idea that the blockade would

be ended, wrong as to result—though it was greatly so as to the cause by which the end would come.  However, that was unimportant; the question being only as to the purity of intent, and the matter resting, therefore, on the *fact* of actual belief; a belief which certainly existed in England when the Admiral sailed; and at New Brunswick.  Undoubtedly—it was said—in these questions *intent* is the matter to be inquired of.  In *Medeiros* v. *Hill,* in the English Common Bench,* and where Sir Nicholas Tindal gave the judgment, the whole reasoning goes on the idea that where no actual entry or exit is shown, the intent is the matter to be inquired into; and, that while in the absence of express proof, any bad intent may be presumed, yet that where the true intent *is* shown none other than it can be inferred. And the stringency of a contrary rule was relaxed by Lord Stowell himself in some cases; as *The Betsey.*† Speaking of Americans during a blockade of European ports, he there said: "I cannot think it unfair to say, that lying at such a distance, where they cannot have constant information of the state of the blockade, whether it continues or is relaxed, it is not unnatural that *they* should send their ships *conjecturally.*"  He expressed like views in *The Adelaide.*‡ It was said finally that here the enterprise, whatever it was, was for the benefit of the cargo; that, in fact, the whole undertaking was a charter of the ship to dispose of this cargo and get another for the same owner, and that no case could be cited in which where *the cargo—the whole object and intent of the voyage—was found to be honest, the ship* (the mere carrier) *was held.*  In this case both ship and crew were but the merest servants of the cargo; all of it belonging to one adventure and having but only one ultimate object.

The Circuit Court affirmed the decree of the district judge; the following being the opinion given by the presiding justice on the former bench:

Grier, J.: I agree with Chief Justice Tindal, in *Medeiros* v *Hill,* "that the mere act of sailing to a port which is blockaded

---

* 8 Bingham, 231.                    † 1 Robinson, 334.

‡ 8 Id. 283; see also The Little William, 1 Acton, 141, per Sir W. Grant.

Statement of the case.

at the time the voyage is commenced is not an offence against the law of nations, where there is no premeditated intention of breaking the blockade." Consequently, if, in the present case, the Admiral had taken out a clearance for Savannah, with the expectation that the blockade might be removed before her arrival, with instructions to make inquiry as to its continuance at *New York*, or *Halifax*, or other neutral port, and after having made such inquiry, had made no further endeavor to approach or enter the blockaded port, her seizure and condemnation as prize could not have been justified; but she presents a very different case. She was off Tybee Island, sailing for the blockaded port. She had made no inquiry on the way; had no reason to believe the blockade to be raised; and when arrested in her attempt to enter, she exhibits a clearance for St. John's, New Brunswick, a port she may be said to have passed, and a letter of instructions from the owners "to call off the harbor of Savannah, to endeavor to meet the blockading ship, and get the officer in command to indorse the register," &c., but to make no attempt to run the blockade.

The clearance is the proper document to exhibit and disclose the intention of a ship. The clearance, in this case, may not properly come within the category of "simulated papers;" but it does not disclose the whole truth. The suppression of a most important part makes the whole false. It may be true, that in times of general peace, a clearance, exhibiting the ultimate destination of a vessel, without disclosing an alternative one, may have sometimes been used by merchants to subserve some private purpose. But in times of war, when such omissions may be used to blindfold belligerents as to the true nature of a ship's intended voyage, and to elude a blockade, the concealment of the truth must be considered as *primâ facie* evidence of a fraudulent intention. The Admiral, with a full knowledge that her destined port is blockaded, takes a clearance for St. John's, and is found a thousand miles from the proper course to such port, in the act of entering a blockaded port; and when thus arrested, for the first time, inquires whether the blockade has been raised.

A vessel which has full knowledge of the existence of a blockade, before she enters on her voyage, has no right to claim a warning or indorsement when taken in the act of attempting to enter. It would be an absurd construction of the President's proclamation to require a notice to be given to those who al-

ready had knowledge. A notification is for those only who have sailed without a knowledge of the blockade, and get their first information of it from the blockading vessels. Now, the primary destination of this vessel was to a blockaded port. If the owners had reason to expect that possibly the blockade might be raised before the arrival of their vessel, and thus a profit be made by their ability to take the first advantage of it, their clearance, in the exercise of good faith, should have made admission of the true primary destination of the vessel. If the truth had appeared on the face of this document, and if the master had been instructed to inquire at some intermediate port and to proceed no further in case he found the blockade still to exist, the owners might justly claim that their conduct showed no premeditated intention of breaking the blockade. But when arrested in the attempt to enter a port known to be blockaded, with a false clearance, it is too late to produce the bill of lading or letter of instructions to prove innocency of intention. In such cases intention can be judged only by acts. The true construction of this proceeding may be thus translated: "Enter the blockaded port, if you can, without danger; if you are arrested by a blockading vessel, inform the captor that you were not instructed to run the blockade, but had merely called for information, and would be pleased to have your register indorsed, with leave to proceed elsewhere." If so transparent a contrivance could be received as evidence of a want of a premeditated intention to break the blockade, the important right of blockade would be but a *brutum fulmen* in the hands of a belligerent. "It would," says Lord Stowell, in some case, "amount, in practice, to a universal license to attempt to enter, and being prevented, to claim the liberty of going elsewhere." In the cases where the stringency of the general rule, established by this judge (but overruled in *Medeiros* v. *Hill*) had been by him relaxed as to American vessels in certain circumstances, the clearances were taken contingently, but directly for the blockaded port, in the expectation of a relaxation of the blockade, with instructions to inquire as to the fact at a British or neutral port. The clearance exhibits the whole truth, and the place of inquiry, their good faith. In these most material facts, this case differs from them.

I concur in the decree of the District Court.

AFFIRMED.

On appeal from this decree of the Circuit Court the matter—including apparently some query as to the right of appeal from the Circuit Court under the act of March 3, 1863,—came for review here. It was argued fully by *Mr. Donahue for the appellants*, and by *Mr. Assistant Attorney-General Ashton* (who had argued it also in the courts below), *for the United States.*

Mr. Justice CLIFFORD delivered the opinion of the court.

Capture of the ship, together with the cargo, was made on the eleventh day of December, 1861, as lawful prize of war, and both were regularly prosecuted as such in the District Court. Claim for the ship was presented by the master on behalf of Fernie Brothers & Co., of Liverpool, in which he alleged that they were British subjects, and the true, lawful, and sole owners and proprietors of the vessel, her tackle, apparel, and furniture. Record also shows that the master filed at the same time a claim for the cargo on behalf of W. & R. Wright, of St. John's, in the province of New Brunswick, in which he alleged that they were the true, lawful, and sole owners and proprietors of the same, and that they also were British subjects. Accompanying the claims for the ship and cargo is the test affidavit of the master, which was filed at the same time, and which contains substantially the same allegations. Preparatory proofs were duly taken, and the parties were fully heard.

District Court entered a decree condemning the vessel as lawful prize, but acquitted the cargo, and ordered that the same be restored to the owners. Claimants of the vessel appealed to the Circuit Court of the United States for that district where the decree of the District Court condemning the vessel was affirmed, and thereupon the claimants appealed to this court.

1. Appeal to the Circuit Court was allowed before the passage of the act of the third of March, 1863, which requires that appeals from the District Courts in prize causes

shall be made directly to the Supreme Court.\* Prior to the passage of that act the Supreme Court had no appellate jurisdiction in prize causes, except when the same were removed here from the Circuit Courts. Exclusive original cognizance of all civil causes of admiralty and maritime jurisdiction was by the ninth section of the Judiciary Act conferred upon the District Courts, and it was conclusively determined, at a very early period in our history, that prize jurisdiction was involved in the general delegation of admiralty and maritime powers as expressed in the language of that section.† First decision to that effect was that of *Jennings* v. *Carson*,‡ but the question was shortly afterwards authoritatively settled by the Supreme Court in the same way.§

Admiralty and maritime causes, where the matter in dispute, exclusive of costs, exceeded the sum or value of three hundred dollars, might under the Judiciary Act be removed by appeal from the District Courts to the Circuit Courts, but such causes could only be transferred from the Circuit Courts to the Supreme Court by writ of error.‖

Provision, however, for appeals from the Circuit Courts to the Supreme Court was afterwards made in cases of equity, of admiralty and maritime jurisdiction, and of prize or no prize, where the matter in dispute, exclusive of costs, exceeds the sum or value of two thousand dollars.

Same act also reduced the minimum sum or value required for appeals from the District Courts to the Circuit Courts to the sum or value of fifty dollars exclusive of costs, and made it the duty of the Circuit Courts to hear and determine all such appeals.¶ Present case was appealed from the District Court to the Circuit while the last-mentioned provision was as applicable to prize causes as it still is to all the other matters of jurisdiction therein specified, and con-

---

\* 12 Stat. at Large, 760.  † 1 Id. 77.

‡ 1 Peters's Admiralty, 7.

§ Glass *v.* The Sloop Betsey, 3 Dallas, 16; 1 Kent's Commentaries, 389; 2 Stat. at Large, 761.

‖ 1 Stat. at Large, 83, 84.  ¶ 2 Id. 244.

sequently the case under consideration is properly before the court.

2. Coming to the merits of the controversy, it is proper to refer to the evidence exhibited in the record, and to deduce from it as far as possible the real character of the adventure, which is the subject of investigation. Owners of the ship were Fernie Brothers & Co., of Liverpool, and the charterers were W. & R. Wright, of St. John's, New Brunswick. Charter-party was dated at Liverpool on the ninth day of September, 1861, and the principal stipulation as to the voyage was that the ship should proceed off the port of Savannah, and if the blockade was raised, then to proceed into port and deliver the cargo as per bill of lading; but if the blockade was not raised, then the ship was to proceed to St. John's, New Brunswick, and there to deliver the same with the usual despatch of the port. Stipulated freight was thirty shillings per ton if the cargo should be landed at Savannah, and fifteen shillings per ton if landed at St. John's, for which latter port the vessel was cleared, as represented in the clearance certificate. Charterers furnished the cargo, but the owners were to have an absolute lien on the same for all freight, dead freight, primage, and demurrage. Vessel sailed for the port of Savannah, and there is not a fact or circumstance in the case tending to show that her primary destination was such, or was ever intended to be such, as is described in the clearance. On the contrary, the owners, in their letter of instructions to the master, admit that the charterers, being anxious to procure a particular cargo from Savannah, made it a condition in taking the ship that she should proceed off that port, so that if the port was open they might secure the very first shipment. When the ship sailed the mate supposed that she was bound for St. John's, but he soon found, as he states, that she was going too far to the southward for such a voyage, and he at once began to suspect that the master intended to go into a southern port. Master's instructions evidently contemplated that the ship might speak other vessels as she approached the coast of the United States, and that the master would be enabled through those

means to ascertain the exact state of affairs, but the master was not directed in any event to abandon the voyage and return.

Substance of the directions in that event was that he was to be guided by any information he might thus obtain, so as not to infringe the blockade regulations, but the clear inference from the document is that the ship was nevertheless to proceed off the blockaded port, and then if met by a blockading vessel to get the officer in command to indorse on the register that the ship had been warned off. Specific directions to the master are that he is to run no risk with the ship, but he is to proceed on the voyage and rather endeavor to satisfy himself as to the blockade, and then find the blockading vessel and get his register indorsed. Cautious as these instructions are, still there is enough in them to show the criminal motives of their authors, especially when it is considered that the ship, under the eye of the owners, sailed from the port of departure under a clearance expressing a false destination. Shippers doubtless expected considerable profits from the sale of the outward cargo, but their controlling motives in chartering the ship were the anticipated profits of the return voyage from the blockaded port. Shipowners were also deeply interested in the success of the adventure, as they were to receive double the amount for freight if the outward cargo was landed at the port of primary destination. Full proof of these facts is exhibited in the record, and it is shown beyond the possibility of doubt that the master, the charterers, and the owners had full knowledge of the existence of the blockade at the inception of the voyage, and there can be no doubt that it was the knowledge of that fact which induced the parties to commence the voyage under a clearance which misrepresented the primary destination of the vessel.

3. Settled rule as established by a majority of this court is that a vessel which has a full knowledge of the existence of a blockade is liable to capture if she attempts to enter the blockaded port in violation of the blockade regulations, and that it is no defence against an arrest made under such cir-

cumstances that the vessel arrested had not been previously warned of the blockade, nor that such previous warning had not been indorsed on her register.*

4. Unlike what is usual in cases of this description it is conceded in this case that the primary destination of the vessel was to the blockaded port; but it is insisted that the mere act of sailing to a port which is blockaded at the time the voyage is commenced is not an offence against the law of nations where there is no premeditated intention of breaking the blockade. Take the proposition as stated, and it is undoubtedly correct, but it is equally well established that it is illegal for a ship having knowledge of the existence of a blockade to attempt to enter a blockaded port in violation of the blockade, and this court decided at the last term that after notification of a blockade the act of sailing for a blockaded port with the intention of violating the blockade is in itself illegal.†

5. But it is unnecessary even to consider any extreme rule in this case, as every pretence of innocence is negatived by the circumstances. Fraud is stamped upon the adventure from the commencement of the voyage to the moment of capture. Such a misrepresentation as that expressed in the clearance might be used to advantage by the master, if his vessel was met by a cruiser in mid ocean as a means to allay suspicion, and it was doubtless intended for some such purpose. While sailing for the blockaded port such a document might be very effectual to enable the master before he had passed the port of pretended destination to deceive belligerents and elude the vigilance of their cruisers. Successful use of that means of deception, however, could not be made at the time of the capture, because the vessel was then off Tybee Island, more than a thousand miles from the proper course to the port specified in the clearance. Seeing that such a pretence would not be likely to avail, the master did

---

* The Barque Hiawatha, 2 Black, 677.

† The Circassian, 2 Wallace, 135; Medeiros v. Hill, 8 Bingham, 234; The Neptune, 2 Robinson, 110; The Panaghia Rhomba, 12 Moore, Privy Council, 168.

not present the certificate of clearance, but resorted to the terms of the charter-party and the letter of instructions, and insisted that those showed that the vessel did not intend to violate the blockade regulations. Arrested, as the ship was, when near the blockaded port, and when heading for the land, and when in point of fact she was in the act of entering the port, the master then, instead of presenting the clearance for the port which he had passed, set up the pretence that his purpose was to inquire whether the blockade had been raised, and claimed that he must be first notified of a fact, which he knew when the ship sailed, before the capture could lawfully be made. Such a defence is without merit, and finds no support in any decided case, or in any acknowledged principle applicable to prize adjudications.

Inculpatory force of the evidence is much increased by the fact that the inception of the voyage is marked by a full knowledge of the existence of the blockade; and that the vessel, instead of touching at the port for which she was properly cleared, where inquiry might have been made, proceeded directly for the prohibited destination. Conduct of the master also, in withholding from the mate all knowledge of the real destination of the vessel, shows that the clearance certificate was evidently obtained in the form referred to as the means, if it became necessary to use it for that purpose, of deceiving belligerents and of eluding the vigilance of national cruisers. None of these circumstances can be successfully controverted; and the claimants admit that the course of the vessel was directly for the blockaded port, and that she was heading for the land at the moment of capture. Every pretence that the vessel intended to desist from her unlawful purpose, if she found that the port was blockaded, is negatived by the circumstances. Those in charge of her knew before she sailed that the port was blockaded, and they also knew that they had no reason to suppose that it was to be raised before her arrival, consequently they made no inquiry and did not wish to make any until it became necessary to do so as a defence or excuse for an illegal act.

DECREE AFFIRMED.