## THE NEWFOUNDLAND.

### (District Court, D. South Carolina. August 17, 1898.)

1. PRIZE—PRACTICE—TESTIMONY IN PREPARATORIO.

   On the first hearing in prize proceedings only the testimony taken in preparatorio, including the ship's papers, can be considered; and it is for the court to determine whether, upon such testimony alone, there is sufficient ground for condemnation or discharge.

2. SAME—VIOLATION OF BLOCKADE.

   Where there has been no proclamation of a blockade of certain ports, but a vessel, on arriving in the region thereof, has been actually notified that they are blockaded, she is not to be condemned for thereafter passing near and by them, unless the government further shows that the blockade as established by the naval officers was still in existence, and proves some act on the part of the vessel indicating an intention to enter such ports, or one of them.

3. SAME—EVIDENCE IN PREPARATORIO.

   At the hearing on the evidence in preparatorio the court cannot consider a paper prepared by the commanding officer of the capturing vessel, which he caused to be inserted in the log of the prize, stating the circumstances under which the capture was made.

4. SAME—EVIDENCE OF INTENT.

   A vessel cannot be condemned when the circumstances do no more than create a suspicion of an intention to violate the blockade; for suspicion, however well founded, cannot be accepted in the place of proof. There must be some overt act, denoting an attempt to do the forbidden thing.

5. SAME—ADDITIONAL PROOFS.

   The fact that the commander of the capturing vessel states that he had information from the American consul at the port of departure that the vessel intended to run the blockade, and that in his opinion her movements and conduct on the night of the capture were suspicious, *held* sufficient to warrant the court in authorizing the taking of additional evidence, when the evidence in preparatorio was insufficient to warrant condemnation.

This was a prize proceeding, instituted in behalf of the United States against the British steamship Newfoundland for an alleged attempt to violate the blockade.

Theodore G. Barker, for claimant.

Edward W. Hughes, Asst. U. S. Atty.

BRAWLEY, District Judge. The British steamship Newfoundland, Frederick N. Malcolm, master, cleared from Halifax, Nova Scotia, July 8, 1898, for Kingston, Jamaica, and Vera Cruz, Mexico. She carried a cargo of flour, pork, corn, wheat, and canned goods, shipped by David Robertson & Co. Bills of lading were issued to them for 4,386 packages for Kingston, and 3,747 for Vera Cruz. These bills of lading are indorsed by them in blank. The charter party was for a voyage of three months to ports of the United States, West Indies, Central and South America, etc., in the customary printed form, and written therein was, "Including open Cuban ports, no contraband of war to be shipped"; and was to terminate at Halifax. Musgrave & Co. were the charterers. She was captured near Havana by the United States ship of war Mayflower, and sent to the port of Charleston as prize of war, was libeled, and the testimony of the master, mate, and seamen was duly taken in preparatorio by

the prize commissioners, and the cause is now before the court upon that testimony and upon the ship's papers. By the well-settled practice, no other testimony can be considered upon this hearing, and it is for the court to determine whether, upon such testimony alone, there is sufficient ground for condemnation or discharge. Test affidavits and answers have been filed by James A. Farquhar as claimant of the ship, and by David Robertson & Co. as claimants of the cargo.

The libel charges that the vessel was captured as prize of war, "in attempting to violate the blockade at Havana," and it has been argued with much force that, inasmuch as a distinct and specific charge has been articulated in the libel, to which the claimants have answered, no other ground for forfeiture can be considered, upon the familiar principle that in all admiralty proceedings the decree must be secundum allegata et probata. As it will hereinafter appear that the decision does not turn upon it, the question will be pretermitted whether the words above quoted may not be rejected as surplusage; but it may be as well to say that the accepted form of libel in prize cases is such as states in general terms that the vessel captured is prize of war. The Empress, 8 Fed. Cas. p. 691 (No. 4,476); Ben. Adm. p. 612. It appears from the master's testimony that he was instructed by the charterers to follow the directions of the shippers of the cargo, and he received from Robertson & Co., through the former captain, verbal instructions to clear for Kingston and Vera Cruz, and to proceed with all haste to the north coast of Cuba, and to enter either the port of Sagua la Grande or Caibairien, but on no account to enter any blockaded port; and, if he found the ports of Sagua and Caibairien blockaded, to proceed to Kingston, and wire for instructions. It seems clear from this testimony that it was the intention of the shippers that the cargo was to be landed at Sagua or Caibairien, where the master was instructed that he would be met by pilots; and that Kingston and Vera Cruz were "contingent" or provisional destinations. Neither Sagua nor Caibairien were included among the Cuban ports in either of the president's proclamations notifying a blockade. The Newfoundland sailed from Halifax on July 9th. Her speed is about 8 knots; her registered tonnage 567 tons. She steered for the "Crooked Island Passage" in the Bahamas, passing thence into the "Old Bahama Channel," and, going in the direction of Sagua and Caibairien, she reached a point northwestwardly from Nuevitas, on the north coast of Cuba, where she was stopped by the United States ship of war Badger at 12:45 a. m., on Monday, July 18th. Her papers were examined by the boarding officer, who informed the master that the whole island of Cuba was blockaded, and was allowed to proceed upon her course. The island of Jamaica lies almost due south from Nuevitas, which, being about 200 miles from the eastern end of the island of Cuba, it is contended that the Newfoundland should at that point have changed her course, and proceeded eastward around Cape Maysi, and thence to Kingston. This undoubtedly would have been the shortest course, and, if Kingston was the destination, the sailing westward from Nuevitas would have carried the ship many hundreds of miles out of her course. It may be here observed

that on the log book kept by the mate the line at the head of each page up to and including Monday, 18th July, is, "Journal from Halifax, N. S., towards Kingston and Vera Cruz." On Tuesday, 19th July, the head line is, "Journal from Halifax, N. S., towards Vera Cruz and Kingston." If, after reaching Nuevitas, there was an intention to go to Vera Cruz, the westwardly course would be the most direct. It is earnestly contended by the attorney for the government that the sailing in the direction of Sagua and Caibairien, after notice by the officer of the Badger that those ports were blockaded, is ground of forfeiture, and in support of such contention he cites The Vrow Johanna, 2 C. Rob. Adm. 109, and The Neptunus, Id. 110. These cases are sufficient authority to the point that the act of sailing for a blockaded port after receiving notification of the blockade is a breach of the blockade. These were cases of blockade by notification. Sir William Scott, in The Neptunus, says:

"In the case of a blockade de facto only, it may be otherwise." In case of a blockade by notification he says: "It is to be presumed that the notification will be formally revoked, and until that is done the port is to be considered as closed up, and from the moment of quitting to sail on such a destination the offense of violating the blockade is complete, and the property engaged in it subject to confiscation. It may be different in a blockade existing de facto only. There no presumption arises as to continuance, and the ignorance of a party may be admitted as an excuse for sailing on a doubtful and provisional destination."

In The Circassian, 2 Wall. 135, Chief Justice Chase says:

"It is a well-established principle of prize law * * * that sailing from a neutral port with intent to enter a blockaded port, and with knowledge of the existence of the blockade, subjects the vessel, and in most cases its cargo, to capture and condemnation. We are entirely satisfied with this rule. It was established with some hesitation, when sailing vessels were the only vehicles of ocean commerce; but now, when steam and electricity have made all nations neighbors, and blockade running from neutral ports seems to have been organized as a business, and almost raised to a profession, it is clearly seen to be indispensable to the efficient exercise of belligerent rights."

In the case of The Admiral, 3 Wall. 603, the ship sailed for Savannah, after notice of the blockade, and was captured "near the blockaded port, and when heading for the land, and when, in point of fact, she was in the act of entering the port." The facts here clearly distinguish this case from that of The Admiral, there being no testimony tending to show any attempt to enter either Sagua or Caibairien. Sailing for a blockaded port and sailing by a blockaded port are very different. No case has been cited to support the view that the sailing in the direction of a port not blockaded by notification, but which is reported to be blockaded de facto, is of itself, without more, a breach of the blockade. Chief Justice Chase, in The Circassian (page 150), takes note of the distinction between simple and public blockades:

"A simple blockade may be established by a naval officer acting upon his own discretion, or under the direction of superiors, without governmental notification; while a public blockade is not only established in fact, but is notified by the government directing it to other governments. In the case of a simple blockade the captors are bound to prove its existence at the time of capture, while in the case of a public blockade the claimants are held to proof

of discontinuance in order to protect themselves from the penalties of attempted violation."

To subject the Newfoundland to confiscation for passing near and. by the ports of Sagua and Caibairien, after he had received notice from the boarding officer of the Badger that these ports were in fact blockaded, the government should show that the blockade as established by the naval officers on that station at Sagua and Caibairien was still in existence, and some act on the part of the Newfoundland indicating an intention to enter those ports, or one of them.   The record contains no testimony on either point, and the contention of the government that she should be condemned on this ground, being supported by neither proof, reason, nor authority, must fail.   Passing by Sagua and Caibairien, ports which appear on the maps as lying to the westward of the middle of the island, the Newfoundland was next boarded by the United States coast guard ship Hudson, about 11:30 a. m. on Tuesday, July 19th, off Cardenas.   Her papers were examined, and she was allowed to proceed.   At ·6:20 p. m. of same day she was boarded by an officer of the United States steamship Tecumseh, was warned not to approach any nearer the island of Cuba, or to attempt to enter any port.   This warning was entered upon the log, and she was allowed to proceed, passing on in a westward course.   The log contains this entry, "8:30 p. m., Havana light bearing south 10 miles," and the master's testimony is that at 10:05 p. m. a gun was fired from the Mayflower, and his ship was seized, at a point 21 miles N. N. W. ½ W. from Havana light.   In answer to the interrogatory, "For what reason, or on what pretense was the seizure made?" the master says:

"Captain Mackenzie [who commanded the Mayflower] said the ship was out of her course for either Vera Cruz or Kingston. I protested against the seizure, saying, so far as I know. I had not violated the blockade law. He ·then asked some one on board—I don't know who he was—what they had on board the Mayflower about the Newfoundland. A letter was brought to him, and, after he read, he told me he had information by or through the United States consul at Halifax to the effect that the Newfoundland had left Halifax with the intention of running the blockade to Cuba or Havana,—I don't know for certain which,—and for that reason he would have to send me in."

The testimony of the chief mate as to the time, place, and circumstances of the seizure accords with that of the master.   He gives the bearing of Havana light as S. E. by S. ½ S., 21 miles, and says they were about 13 or 14 miles off shore.   A typewritten sheet of paper, containing the following statement by Commander Mackenzie, is pasted in the log book:

"U. S. S. Mayflower.

"Off Havana, Cuba, July 19, 1898.

"July 19, about 8:30 p. m., the Mayflower, then being about eight miles north of Morro light, Havana, started in chase of a faint light to the northward, which was only occasionally visible. The chase occasionally changed course two or three times, and was finally brought to about 10:30 p. m., about 17 miles north-northwest of the Morro. She had been warned by the Tecumseh about 6 p. m. (four hours and a half before we brought her to), and previously by the Badger. She was out of her shortest course either for Jamaica or Vera Cruz, for both of which places she had clearance. The

conduct of the vessel was so suspicious that I feel obliged to send her to the nearest healthy port. 		M. R. S. Mackenzie,
"Commander U. S. Navy, Commanding U. S. S. Mayflower."

The proctor for claimant urges that this statement cannot be considered upon this hearing, which is confined to testimony of persons aboard and to the ship's papers, and the point seems to be well taken. An entry in the log of a captured ship, stating the fact that the ship was boarded, or warned, or captured at a time stated, imports verity, and may be considered as so far a part of the ship's papers as to be properly cognizable upon the preliminary hearing; but, inasmuch as an officer of the capturing ship could not, upon such hearing, be heard to testify concerning the circumstances of such capture, and the reasons therefor, it does not seem to the court that a written statement of such character, not under oath, and attached to the ship's papers, is a part thereof, which, under the practice, is to be considered. Taking the testimony which alone is now before the court, there is nothing in it which shows or tends to show that the Newfoundland. at the time of capture, or at any other time, was heading for the port of Havana, or any other port.

The cases cited by the district attorney in support of a sentence of condemnation will now be examined. In The Circassian, 2 Wall. 151, the court says: "At the time of the capture, ship and cargo were on their way to New Orleans [the blockaded port] under contract that the cargo should be discharged there, and not elsewhere, and that the blockade should be forced in order to the fulfillment of that contract." The charter party contained an express stipulation that she was to "run the blockade if so ordered by the freighters." With this charter party was a memorandum of affreightment, by which Soubry, the agent, engages "that the merchandise shall not be disembarked except at New Orleans, and to this effect he engages to force the blockade." Numerous letters were found aboard, written to correspondents in New Orleans, in which the steamer is spoken of as "loaded entirely with our products for New Orleans," as being a fast sailer, and being intended "to convey to your place, New Orleans, by forcing the blockade, a very fine cargo," etc. And it was also proved that at the moment of capture the captain ordered the destruction of a package of letters, which the court says would be a strong circumstance, and, taken in connection with others, "it irresistibly compels belief of guilty intent at the time of sailing and time of capture." In The Cornelius, 3 Wall. 225, the court says that the master "made every effort to escape by crowding sail and running in towards the blockaded port." The steward testified "that the master told him that he had intended to run the blockade from the first," and there were other circumstances of suspicion in the character and conduct of the charterer and supercargo, etc. In The Admiral, 3 Wall. 616, the facts have already been referred to. She was heading for the land, and in the act of entering the blockaded port for which she had sailed after notice of the blockade. In The Cheshire, 3 Wall. 234, one of the owners and a claimant was a partner of an enemy, who resided in Savannah, and the cargo was condemned as enemy's property. The ship had run the blockade on her outward voyage. She knew of the

blockade before she sailed. She was captured off Savannah, and claimed that she had called there merely for the purpose of inquiry; and the court held that the circumstances had "the appearance of a device to cover up a settled purpose to elude the blockade." The Herald, 3 Wall. 768, was a case where the vessel was captured in attempting to escape from a blockaded port, and the court, arter reviewing the facts, says: "It would be difficult to make more conclusive proof of the existence of the blockade, or of notice of the fact to the master of the captured vessel." The Rising Sun, 2 C. Rob. Adm. 104, was an American vessel sailing from a French port, ostensibly to Altona, but in reality bound to Guernsey. Sir William Scott says: "It is well known that, although it is the ordinary form of clearing out of a belligerent country to bear an ostensible destination to a neutral port, yet no one imputes that as a fraud, nor is it considered such an act as would justly subject neutral property on board neutral ships to be molested on that account." The real question in that case was as to the effect of the spoliation of papers. The Hurtige Hane, 2 C. Rob. Adm. 124, was the case of a ship actually entering a blockaded port, and the defense set up was that she went in from distress and want of water. The only question considered was as to how far such pretenses could avail. The Calypso, 2 C. Rob. Adm. 154, was the case of an attempt of a neutral to cover enemy's property, a case which Sir William Scott declared to be "poisoned with fraud in every vein." No question arose therein pertinent to the case now under consideration.

These are all of the cases cited by the counsel for the government, and the pressure upon the court has been so great that it has had but little time for independent investigation. So far as its examination has extended, no case has been found where a sentence of condemnation was passed upon such a state of facts as is presented in this record. How far short the cases cited fall in showing cause for condemnation the circumstances hereinabove recited demonstrate. These circumstances do no more than create a suspicion that there was an intention to enter a Cuban port in violation of the blockade; but suspicion, however well founded, is not proof, and cannot be accepted in any court in place of evidence. There must be some overt act denoting an attempt to do the thing forbidden, some fact in addition to the proved intention to commit the infraction, which shows that the unlawful intent is persisted in, and is being carried into execution. As this court has in a recent case had occasion to remark, the testimony in preparatorio rarely affords opportunity for such proof. From the master's testimony it appears that Commander Mackenzie informed him that he had information through a letter from the American consul at Halifax that the Newfoundland sailed with intention to run the blockade. The court can form no opinion as to the probable weight of such testimony. It also appears that Commander Mackenzie thought the movements and conduct of the Newfoundland on the night of the capture suspicious. The court has personal acquaintance with Commander Mackenzie, and knows that in character, intelligence, and attainments he is the peer of any officer of the navy; but, highly as it values his opinion, it cannot accept it in lieu of proof. It

furnishes ground for ordering further evidence. In The Sir William Peel, 5 Wall. 534, the chief justice, after stating the rule that upon the first hearing no evidence is admissible except that which comes from the ship, either in the papers or the testimony of persons found on board, says: "If upon this evidence the case is not sufficiently clear to warrant condemnation or restitution, opportunity is given by the court, either of its own accord or upon motion and proper grounds shown, to introduce additional evidence under an order for further proof."

An order has accordingly been entered allowing further proof, and, as that will probably involve delay, an order will be entered, if moved, for the discharge of the ship and cargo upon stipulation for their value.