## THE NEWFOUNDLAND.

(District Court, D. South Carolina. September 12, 1898.)

1. EVIDENCE—ENTRY IN SHIP'S LOG.
   An entry made in a vessel's log with full knowledge, or opportunity for ascertaining the truth, must be accepted as the truth when it tells against the party making it.

2. WAR—BLOCKADE OF ENEMY'S PORTS—EVIDENCE OF VIOLATION BY PRIZE.
   Proof that a neutral steam vessel approached a blockaded port in time of war, with knowledge of the blockade, and, after being warned away, loitered in the vicinity in the nighttime, where she would be enabled to watch for an opportunity to elude the blockade, and enter the port, is sufficient to condemn such vessel as prize, in the absence of positive evidence in her behalf showing that her presence there was innocent.

3. SAME—RIGHTS OF BLOCKADING POWER IN SURROUNDING WATERS.
   The law of blockade can only be rendered effective by conceding to a belligerent maintaining a blockade of an enemy's port a certain dominion over the surrounding waters, though without strictly definable limits as to extent or character; and the seizure of a neutral vessel in the open sea, though 18 or 20 miles from the blockaded port, and steering in an opposite direction, is not a marine trespass, where a previous attempt on the part of the prize to violate the blockade is shown.

4. SAME—PRIZE—EVIDENCE CONSIDERED.
   The Newfoundland, a neutral steam vessel clearing from Halifax, and laden with provisions, was brought to by one of the blockading fleet off Havana about 6 o'clock in the evening, and at a point 10 or 12 miles distant in a northeasterly direction from the port. She was warned away, and started on a course a little north of west. At 8:30, as shown by her log, she was off Havana, and 10 miles distant. At 10 she was captured by another vessel of the blockading fleet at a point to the northwest of the port, and from 17 to 21 miles distant, while steering to the west. At her usual rate of speed she should have been several miles further on her course. Her officers knew of the blockade, and the evidence in explanation of her presence near Havana was not consistent nor satisfactory, and it was left somewhat uncertain as to whether her lights were kept burning during the evening. *Held*, that she must be deemed to have been loitering near the port with intent to enter if an opportunity offered, and, with her cargo, was lawful prize, though she may have abandoned the attempt to run the blockade before her capture.

This was a proceeding by the United States for the condemnation of the steam vessel Newfoundland and her cargo as prize for having attempted to run the blockade of the port of Havana.

Abial Lathrop, U. S. Atty., Edward W. Hughes, Asst. U. S. Atty., and B. A. Hagood, Asst. U. S. Atty.

Theodore G. Barker, for respondent.

BRAWLEY, District Judge. The opinion filed August 17th, on the preliminary hearing (89 Fed. 99), based upon the testimony in preparatorio, sets forth the facts relating to the conduct of the Newfoundland up to the evening of July 19th, when she was captured off the port of Havana, and the cause is now before me upon an order for further proof. As was stated in that opinion, a mere suspicion of an intention to violate the blockade, however well founded, is not sufficient ground for condemnation. There must be some overt act de-

noting an attempt to do the thing forbidden, some fact in addition to the proved intention to commit the infraction, which shows that the unlawful intent is persisted in, and is being carried into execution. The precise question now to be considered is whether there is sufficient evidence of acts denoting the intention to break the blockade at Havana, for to that point the additional testimony has been directed. Upon the preliminary hearing the court was led to believe that the American consul at Halifax was in possession of information that would have an important bearing upon the issue, but no testimony from that quarter has been offered. Actual entrance into a blockaded port rarely can be and need not be proved, for, if that were so, captures would cease to be possible; and as no instrument has yet been devised by which the operations of the human mind can with certainty be disclosed, and intentions must be inferred from acts, so it must be that in all cases of this nature, proof must rest largely upon presumptions, and, accordingly as those presumptions are or are not unavoidable, acquittal or conviction follows. Condemnation cannot justly follow proof of facts from which mere mental intention can be inferred, unless there is also proof of acts from which the presumption necessarily arises that there is the beginning to put into execution the unlawful intent. The sailing for a prohibited port, after knowledge of the blockade, with intent to enter, is held to be such overt act. So, the appearance before a blockaded port for the alleged purpose of inquiry, when the blockade is generally known, has been held to be a breach of the blockade, on the ground that such approach would afford great facility for eluding it, and knowledge honestly sought could be obtained elsewhere.

Sir William Scott is the great luminary from which we derive most of our light on the law of prize. He regarded the breaking of a blockade as an act of deep turpitude. In that opinion I do not agree, perhaps from an early experience of, and modest participation in, some of its benefits; and I am aware that, notwithstanding his great ability, his purity of character, and charming manners, he did not escape the censure of his contemporaries, and that the severity of his judgments led to the charge of "ministerial subserviency." In The Neutralitet, 6 C. Rob. Adm. 35, with a vigor and beauty of diction which must charm, if it does not convince, he thus states the law:

"It will not be necessary in the present case to lay down a general principle on this point, but I am disposed to agree to a position advanced in argument that a belligerent is not called upon to admit that neutral ships can innocently place themselves in a situation where they may with impunity break the blockade, whenever they please. If the belligerent country has a right to impose a blockade, it must be justified in the necessary means of enforcing that right; and if a vessel could, under the pretense of going further, approach cy-pres, close up to the blockade port, so as to be enabled to slip in without obstruction, it would be impossible that any blockade could be maintained. It would, I think, be no unfair rule of evidence to hold as a presumption de jure that she goes there with an intention of breaking the blockade; and if such an inference may possibly operate with severity in particular cases, where the parties are innocent in their intention, it is a severity necessarily connected with the rules of evidence, and essential to the effectual exercise of this right of war."

Describing the catholic character of the prize jurisdiction, he thus expressed himself:

"I trust that it has not escaped my anxious recollection for one moment what it is that the duty of my station calls for from me, namely, to consider myself as stationed here, not to deliver occasional and shifting opinions to serve present purposes of particular national interest, but to administer with indifference that justice which the law of nations holds out, without distinction, to independent states, some happening to be neutral and some to be belligerent. The seat of judicial authority is, indeed, locally here, in the belligerent country, according to the known law and practice of nations; but the law itself has no locality. It is the duty of the person who sits here to determine this question exactly as he would determine the same question if sitting at Stockholm; to assert no pretensions on the part of Great Britain which he would not allow to Sweden in the same circumstances, and to impose no duties on Sweden, as a neutral country, which he would not admit to belong to Great Britain in the same character." 1 C. Rob. Adm. 295.

With this statement of the principles of law generally applicable in cases of this nature, the circumstances attending the capture will now be considered, as bearing upon the charge that the Newfoundland was loitering in the neighborhood of Havana with intent to enter. Lieut. Evans, in command of the U. S. S. Tecumseh, testifies that about 5 o'clock in the afternoon of July 19th, while on his station in the blockading squadron, 6 or 8 miles to the north and eastward of Havana light, and about 3½ miles from the nearest shore, he sighted the Newfoundland moving towards him on a westerly course; that he immediately stood towards her at full speed,—about 10 knots,—. and overhauled her, sending his mate aboard to examine her papers. He estimates his position at the time as being latitude 23° 15' N., longitude 82° 13', and on a diagram prepared by the navigating officer of the Mayflower, and offered in evidence, he fixes her position as being unquestionably within a dotted circle,—thinks that it was about the center of the circle, but, having taken no measurements at the time, would not undertake to fix it closer than within three miles. He fixes the hour of boarding at 5:35, and says that he left her "in the vicinity of 6 o'clock," she bearing off on a course about west by one-half north. Mate Nickerson of the Tecumseh fixes her position at the time of sighting the Newfoundland at 6 to 8 miles from Morro light, and about 3½ to 4 miles from the nearest shore, the Newfoundland being at that time about 9 miles to the northward and eastward, sailing west; the Tecumseh sailing about 4 miles to overhaul her. He fixes the hour of boarding at 5:35 exactly, and says that he returned aboard his ship about 5:50. He failed to enter upon the log of the Newfoundland the hour of boarding, as is usually, and always should be, done. He locates the point of boarding upon the diagram as does Lieut. Evans; saw the Newfoundland for about 10 minutes after she stood off, one or two points to the north of west; and says, "It began to settle down dusk then." Ensign Pratt, of the Mayflower, whose watch began at 8 o'clock, testifies that about 8:20 he picked up a small light bearing north by west from him, reported the same to the commanding officer, who ordered the ship headed for it north by west, and the engines rung ahead full speed. Shortly after heading for it, the light was lost, but, standing on the same course about 20

minutes, and putting on forced draft, the light was picked up again a little to the westward. Altering his course, and heading north-northwest, the light shortly disappeared again. He gradually changed his course to the westward until he headed about northwest, standing on that course about 30 minutes, still not seeing the light, when about 9:10 he sighted it again, bearing southwest on his port beam, and inshore, headed for it again, and stood on until about 9:30, when the light was seen outshore of him on his starboard beam, and headed for it again, and came up with her at 10 o'clock. From subsequent developments it is probable that the light thus described was that of a lantern hanging on the wall of the companion way in the after deck house of the Newfoundland, visible only when nearly abeam through the doors on either side. It would be open only to about three-fourths of a point of the compass, and the Mayflower, at full speed, making at times 16 miles an hour, would pass the point of visibility, until, by changing her course, it would again become visible, and be picked up first on one quarter, then on the other. When the light was first seen, the Mayflower was heading east-northeast, and the light was bearing north by west from her, a point forward of the port beam, and estimated to be from two to three miles distant. No other lights were seen on the Newfoundland until she was overhauled. At that time all of the regulation lights were found to be burning brightly. Lieut. Culver, navigating officer of the Mayflower, describes the chase substantially as above, and exhibits a tracing made on July 20th, showing the estimated positions of the respective vessels at the time when the light was first discovered and at the time of the capture, and the course sailed by each. Commander Mackenzie, of the Mayflower, was the senior officer of the blockade off Havana. The Mayflower covered about five points of the compass on the bearing from Morro light; and had been on that station during the month of July. He says that about 8:30 a faint light was reported about north by west of him, which he thought was a plain lantern. He describes the chase, and locates the positions of the two vessels on the tracing prepared by Lieut. Culver. From this testimony, and upon this diagram, it would appear that the Newfoundland, when boarded by the Tecumseh, was at a point within a circle whose center is 10⅔ miles from Morro light, whose bearing was southwest one-half west.

The testimony from the Newfoundland, relating to the same matter, will now be stated. Capt. Malcolm, the master, says that he was boarded by the mate of the Tecumseh 14 miles off shore,—off the nearest land,—while sailing on a westward course; that the boarding officer, after examining his papers, advised him not to go any nearer the land, lest he should get a shell into him, and left him at 6:30; that thereafter he stood on a course one point north of west until 8 o'clock, when the Havana light bore about south by west, and from that time he put his ship back on a course due west, which he followed until boarded by the Mayflower. He exhibits a chart on which he has marked his course, and says that at 8:30 he passed Havana light, being 17½ miles from it; that at 10 o'clock, when boarded by

the Mayflower, he was 21 miles from Havana light, which bore then southeast by south one-half south. Salkus, the mate of the Newfoundland, testifies to the boarding by the Tecumseh at 6:10, and that the Havana lighthouse and Morro castle were not visible; that they started on their course at 6:30, and at 8:30 were abreast of Havana light, which bore south about 16 or 17 miles. In explanation of the entry in his log he says that he took no bearings at the time of the entry, and knew that the ship was further off than 10 miles. . He says that at the time of the capture Morro light was not visible from the bridge, but that he saw it from the compass pole, 15 feet above the bridge. Payne, the engineer, testifies to the boarding by the Tecumseh at 6:10, and his log contains an entry showing that the engines stopped at 6:10, and started again at 6:30.

It thus appears that there is a wide divergence in the testimony as to the point at which the Newfoundland was when boarded by the Tecumseh, and some divergence as to the time of such boarding. Lieut. Evans and his mate fix this location within a circle whose radius is 3 miles. They say that they are certain as to her location within 3 miles, and believe that she was about the center of that circle, which is $10\frac{1}{2}$ miles from Morro light. Capt. Malcolm and his mate fix the location at a point 24 miles from Morro light, $13\frac{1}{2}$ miles from the center of the circle above referred to, and $10\frac{1}{2}$ miles from that point of the circle nearest to the Newfoundland. There is a marked discrepancy, and the first point to be decided is, which is correct. Applying the usual tests by which testimony is weighed,— the intelligence of the witnesses, their opportunities for knowing the truth, the likelihood of error arising from considerations of interest, and other influences which commonly sway men's minds,—there can be no doubt that there is a preponderance of probability in favor of that side which, having no interest in the controversy, has the greater opportunity of knowledge. Lieut. Evans and his mate were on cruising grounds with which they were familiar. There could be no difficulty in ascertaining their position from the bearing of Morro, which was in plain sight, day and night. They were within three or four miles of the shore, with well-defined objects from which bearings could be had. It was their manifest duty to know where they were, for they had to keep within certain prescribed limits. They are men of education, character, and intelligence, and their testimony cannot be discredited without imputing to them a reckless carelessness for which there is no warrant. Neither Capt. Malcolm nor his mate were familiar with the locality. The former had once before been to Havana, the latter never. Their interest is obvious. I have no difficulty in coming to the conclusion that the preponderance of evidence fixes the position of the Newfoundland within the described circle when boarded by the Tecumseh. I am not so clear as to the time. The mate Nickerson fixes it at 5:35 precisely, and says that he returned to the Tecumseh at 5:50; but he says that he watched the Newfoundland for about 10 minutes after she left, when "it began to settle down dusk." The sun set in that latitude on that day about 6:30, and there is little twilight. The officers of the Newfoundland fix the

hour of boarding at 6:10, and time of departure at 6:30, and these figures are entered upon the engineer's log. This log has been in possession of the claimant since the capture, and some erasures appear in another part, which may hereafter call for comment, and it therefore cannot be accepted as absolute verity, but giving the ship the benefit of the reasonable doubt which the testimony warrants, assuming that she sailed at 6:30, she is next seen by Ensign Pratt about 8:20, when he sighted a small light bearing north by west from the Mayflower, whose station on the cruising grounds lay next west of the Tecumseh, and whose position at that time was about six miles north by west from Morro light. This small light was estimated to be about two or three miles from the Mayflower. The mate of the Newfoundland made this entry upon her log: "8:30 Havana light bearing south, 10 miles." If this testimony is taken as true, this would place the Newfoundland at a point 7 miles from the center of the circle adopted as the point of departure, and 10 miles from the extreme western circumference of it, and it would follow that she had consumed two hours in making that distance. As her speed during her voyage was on an average nearly 8 knots an hour, there is a considerable margin of time to be accounted for, which she endeavors to do by fixing her location at 8:30 at a point 17 miles from Havana. This is the testimony of her master, and the mate concurs in it, saying that the entry in his log was not an accurate statement of the ship's position at that time; that it was only intended to show that she was at least 10 miles from Havana light. It is not necessary to discuss nor decide now how far a ship is concluded by the entries in her log. If the party making such entry is shown to have been drunk at the time, or habitually careless, or if made in a perfunctory way, without observations, or the opportunity of observation, little weight might be given it; but, the log being intended to be a correct record of the facts contained therein, an entry made with full knowledge and opportunity of ascertaining the truth must be accepted as the truth if it tells against the party making it, and can be denied no more than a deed. If it is the result of a mistake, there must be conclusive evidence of the mistake. It is sufficient to say that such evidence has not been adduced here, and the entry upon the log, confirmed as it is by the testimony from the Mayflower, fixes the position of the Newfoundland at 8:30 at a point about 10 miles from the Havana light. From that point to the point of seizure her course can be marked with sufficient accuracy. That she sailed on a straight course from 8:30 to 10 o'clock, and that such course led her away from the entrance into the port of Havana is entirely clear, whether the point was 17 miles from Morro light, as claimed by the Mayflower, or 21 miles, as claimed by the Newfoundland, or 18 miles, as agreed upon by her master and Ensign Pratt as the point from which they took their departure after the seizure, when they started upon their voyage to Charleston.

The next incriminating charge is that the Newfoundland was sailing without lights. Ensign Pratt, who first sighted her, says he picked up a small light. All the witnesses from the Mayflower describe this light as that from an ordinary lantern, and not the mast-

head light. None of these witnesses saw any of the regulation lights until they came up with her about 10 o'clock, when they were all brightly burning. After the chase began, these regulation running lights, being visible only two points abaft the beam, would naturally not be seen. Coming westward from the point where she left the Tecumseh to the point where the faint light was sighted, her masthead light, whose visibility by the regulations is at least five miles, should certainly have been seen if there was proper vigilance aboard the Mayflower. That Ensign Pratt was vigilant is demonstrated by the fact that he picked up the dim light two or three miles off at 8:20. He went on duty at 8 o'clock. The officer who had the watch before that hour was not examined, nor were the lookouts, who are described by Commander Mackenzie as uncommonly efficient men. As it is, the testimony leaves this question open to reasonable doubt. While it is probable that the masthead light, if burning, and not screened, would have been visible to Ensign Pratt at the time he described the small light, he does not say with certainty that it would have been; there being but a narrow limit of visibility. The witnesses from the Newfoundland, including the sailor who lit them, all testify that the lights were lit at the usual hour, and they were all burning when she was overhauled. Commander Mackenzie and other witnesses from the Mayflower all testify that the small light already described was the only one seen; that there were no stray lights, such as are commonly seen aboard a steamer in the nighttime. Taking the point of departure to be somewhere within the circle already described, and the time of departure as 6:30, and the rate of speed at nearly eight knots, and following the courses described,—west by north until 8 o'clock, and then due west until 10 o'clock,—and plotting it upon the chart, I must conclude that she would have been some miles farther west than either the point claimed by her or the point testified to by the officers of the Mayflower, at the point of capture at 10 o'clock, unless she had loitered somewhere upon her route. Outside the domain of the exact sciences, absolute certainty is rarely attainable, and there must always be an element of doubt as to every transaction, the proof of which rests upon fallible human testimony, nowhere more fallible than in estimates of location and distances upon water. With some misgivings as to the rectitude of my judgment, but with none as to the rectitude of the considerations which move it, and fully conscious of an imperfection in nautical knowledge, which, in a case of this nature, may lead unconsciously to error, my conclusion is that the Newfoundland, with full knowledge of the blockade at Havana, approached sufficiently near to that port, on the night of July 19th, to render it easy to elude the blockade, and tarried there sufficiently long to enable her to discover whether she could do so with safety; and this finding renders it necessary for her to show from all the circumstances preceding, accompanying, or following that act that her presence there was innocent. It is earnestly contended that, being a neutral vessel,—not laden with contraband of war,—her capture 18 or 20 miles from the port of Havana, while sailing away from it, and on the open sea, was a marine trespass. This contention rests upon

the ground that there is no sovereignty over the sea, and that it is free to the ships of all nations,—a proposition admittedly true in times of peace, but not unqualifiedly true in time of war, for the right of search and the right of blockade conceded to belligerents by the law of nations rests upon the negation of it. The right of blockade can only be effectively exercised by conceding to the belligerent a right of dominion, precarious it may be in tenure, transient in duration, and restricted in area, but none the less a dominion and control over the waters surrounding the place beset. The great object of the blockade is to cut off all communication between those who are within and those who are without the port blockaded, and the law accords to the belligerent nation certain rights, or, rather, privileges, undefined by any written code, and, in the reason of things, indefinable, whereby such object may be effected. All these oppressive incidents, generally vexatious to neutrals, often mischevious, and sometimes unjust, are inherent in the law itself. Among them is that which requires a neutral, found in suspicious proximity to a blockaded port, under circumstances indicating an intention to enter, to give an account of herself. If innocent, she can generally do so.

We will now look into the character and conduct of the Newfoundland, to see whether her presence off Havana is consistent with innocent intent. She is a small steamship, lately employed in the sealing business. She sailed from Halifax, July 9th, loaded with a cargo of provisions, under command of Capt. Malcolm, who was employed for that voyage. She had two clearances, one for Kingston and one for Vera Cruz. Commander Mackenzie testifies that it is not the practice of any American custom house to give two clearances. Capt. Malcolm says that this is not unusual in Halifax, and that he has generally had separate clearances for separate ports, sometimes five or six, whenever he had cargo for each. We have no statute prescribing any regulation on this subject, and wherever a ship has separate cargo for separate ports I can see no reason why she should not have a clearance for each, and I am informed that it is the custom at this port to give such separate clearances. While I cannot hold that separate clearances for Kingston and Vera Cruz were in themselves suspicious, it is a cause of grave and just suspicion that her real and primary destination was to neither of those ports, as subsequent events proved. Capt. Malcolm, in his testimony in preparatorio, said that his verbal instructions were to sail for Caibairien or Sagua la Grande, and, if those ports were blockaded, to go to Kingston, and cable for orders. For reasons, into which it is not the province of this court to inquire, neither Sagua nor Caibairien were included among the ports blockaded under the proclamation of the president, and he had the right to go to either. Whether in so doing without proper clearances he would have incurred penalties under the municipal regulations of Great Britain or of Spain is not within the scope of this inquiry; certain it is that he would have committed no offense cognizable here. Taking his course to the southward, he next appears off Nuevitas, where he is boarded by Lieut. Titus of U. S. S. Badger, and is informed by him that the whole coast of Cuba is

blockaded. The case is not presented in an aspect which requires any determination of the question, whether that sort of a blockade was effective or legal, as he did not go to either Sagua or Caibairien for the purpose of testing its validity, which he might well have done. According to his testimony in preparatorio, and it is repeated on this hearing, he abandoned all thought of entering either of those ports upon hearing that they were blockaded. His course then should have been around the eastern end of the Island of Cuba to Kingston, by way of Cape Maysi, for the course around the western end, by Cape Antonio, was nearly a thousand miles further. In these days of sharp competition, intelligent men do not make such long detours in the prosecution of legitimate business. The explanation given is that he wanted to satisfy his charterers by showing them that he had passed by the port to which he was directed to go, and, further, that he apprehended that he would subject himself to suspicion by changing his course at that time. The answer to this is obvious. His charterers did not instruct him to go by the ports of Sagua and Caibairien, but to go to them; and if he did not intend to do that his proceeding in that direction was such a futile, time-consuming, and coal-consuming venture that it staggers credulity to accept it as the true reason. Nor does the other reason given seem much more satisfactory. There was nothing unlawful in his setting out for Sagua, or any other open port in Cuba; and if, after information of the blockade, it became necessary to change his course in order to go by the shortest route to Kingston, his contingent destination, there would have been no risk in disclosing the truth. In this, as in most of the affairs of life, the straightforward course would have been the wisest course. That it was not taken suggests the conclusion that neither Sagua nor Caibairien was the real destination. It appears from the testimony that neither at the time of capture nor afterwards was anything ever heard about Sagua or Caibairien until it came out in the examination of Capt. Malcolm before the prize commissioners. None of the other officers of the ship appear to have known about it. The mate seems to have thought that they were going to Vera Cruz. In the engineer's log there appears every day from July 9th to July 18th, inclusive, a line at the top of the page, containing the words, "From Halifax to Vera Cruz and ———, Cuba." The word "Kingston" is written over and partially obliterates the word "Cuba." There is a blank space before the word "Cuba" evidently intended to be filled in. "Havana" would about fill it. The engineer appeared to be the most intelligent man on the ship, after the master. From this entry on his log it is plain that he knew that the ship's destination was Cuba, and there would seem to be no good reason why the name of the port should have been left blank if it was Sagua, or any other open port. In the absence of any testimony confirming the master's statement that his instructions were to go to Sagua or Caibairien, and there being nothing in' his conduct showing that that was his real destination, I must hold it to have been a pretensive destination, and his appearance before Havana is therefore not satisfactorily explained. Lieut. Culver, of the Mayflower, who boarded her, says that when he asked Capt.

Malcolm where he was bound, he was very vague in his replies, sometimes saying Kingston and sometimes saying Vera Cruz; and when asked whether he was shaping his course by way of Cape San Antonio he replied that he had not made up his mind. In the same conversation he said that he had been making eight knots an hour from the time he was boarded by the Tecumseh to time of overhauling. To Commander Mackenzie, on the Mayflower, he said he was making for Vera Cruz, if he had coal enough, and then to Kingston if he did not have enough coal. He was going to Kingston in order to take on coal. To Lieut. Pratt, the prize master on the voyage up to Charleston, he said that he was bound for Vera Cruz. Capt. Malcolm says in his testimony that his instructions were to go to Kingston if he found the ports of Sagua and Caibairien blockaded, and from there he was to cable for instructions, and that Kingston was his destination; that he had plenty of coal to get to Kingston, but not enough to go to Vera Cruz and then Kingston. It must be conceded that there is no proof of any attempt to enter the port of Havana; that is to say, no witness has testified to seeing her heading that way. It must also be admitted that the testimony as to loitering falls very far short of the proof offered in The Neutralitet, 6 C. Rob. Adm. 30; The Apollo, 3 C. Rob. Adm. 308; The Charlotte Christine, 6 C. Rob. Adm. 101; The Gute Erwartung, Id. 182,—the cases relied on by the government. All of these cases arose before the days of steam power, but the principles upon which they rest, and which I hold to be sound principles, require their application to conditions now prevailing, when the use of steam power renders the eluding of blockades a far more facile undertaking; and I feel compelled to hold that the whole purpose of a blockade would be rendered nugatory if a steam vessel is allowed, after notice, to approach in the nighttime, so near to a blockaded port as to be able to see signals from the shore, and to watch for the opportunity of entering if it should appear that the coast is clear, or the vigilance of the belligerent cruisers is for the time relaxed. A ship so approaching lays herself under the unavoidable imputation of being engaged in an attempt to break the blockade, and there is a necessary presumption of sinister motive which must be rebutted by positive proof that her presence there is innocent, that she is there either from some necessity, or in the course of a voyage which requires her to pass that way. I feel bound to hold that the weight of the testimony is on the side of the government in fixing her position at 6 o'clock at a point from 5 to 8 miles from the nearest shore, and not, as fixed by her officers, at a point about 14 miles from the shore; for why should the mate of the Tecumseh have warned them to keep off farther from the shore—a warning which they admit having received—if they were where they claimed to have been, far beyond the reach of any shells against which the warning was given. For this and for the reasons already stated I must conclude that she was at that point at 6 o'clock, and that at 8:30 she was at a point not more than 10 miles distant, and not more than 10 miles from Havana light, just outside the cruising grounds of the blockading fleet, from which she could readily see whether it was safe for her to attempt

to enter. Having denied that she was there, and having failed to sustain that denial by adequate proof, and having failed to give a satisfactory account of her being in that neighborhood at all, I am compelled to condemn both ship and cargo. I do so with great reluctance. The attempt to carry a cargo of provisions to a starving people, even for purposes of speculation, excites rather sympathy than condemnation, and confiscation is a harsh punishment for such offense. No country has ever yet been brought to terms of peace by restrictions upon its commerce with neutrals, for the great issues of war are decided by the contests of armies upon land and of navies upon the sea. In their ultimate decision the seizure and confiscation of private property, whether of enemy or of neutral, weighs as lightly as a feather floating on the summer breeze; but until some Amphictyonic council of the civilized states new-models the law of nations, and adopts the gospel of commercial peace in the midst of hostile war, I am bound, sitting in this seat, to administer the ancient law as I find it, and am not permitted to soften its harsh provisions. Both ship and cargo are the property of citizens, not merely of a neutral, but of a friendly, state, and, it should be remembered (it can never be forgotten), of a state which in a supreme crisis has demonstrated its sympathy and friendliness; and there may be considerations of comity and of public policy—considerations into which, sitting in this court, I have no right to enter—which may suggest as an act of grace the mitigation of the extreme demands which, under the law of nations, are of incontestable right.