## THE OLINDE-RODRIGUES.

(District Court, D. South Carolina. August 13, 1898.)

**1.** PRIZE—PROCEDURE—EVIDENCE IN PREPARATORIO.

On the first hearing in prize proceedings only the evidence in preparatorio is admissible, which evidence is confined to the depositions of officers, crew, and passengers of the captive ship, and the papers and documents found aboard.

**2.** SAME—VIOLATION OF BLOCKADE.

Sailing for a blockaded port with knowledge of the blockade is a breach thereof, and subjects the ship to condemnation.

**3.** SAME—KNOWLEDGE OF BLOCKADE—PRESUMPTION.

It being lawful for neutrals to trade with the enemy, and a blockade not being a necessary consequence of a state of war, it is not to be assumed that a neutral possesses any knowledge of its existence until the fact of its establishment is in some way brought home to him.

**4.** SAME—NOTICE OF BLOCKADE.

While the French and other continental jurists hold that there must be notice from the government instituting the blockade, and also notice from a vessel at or near the blockaded port, that the blockade has in fact been established, the rule accepted in England and the United States is that notification at the port of blockade should only be required when there has not been sufficient time for neutral ships at sea or in distant ports to become aware of its existence.

**5.** SAME—VESSEL AT SEA.

A vessel at sea when a proclamation of blockade of one of her ports of destination is issued has the right to proceed upon her voyage until arrival at the blockaded port, unless notice of the blockade was actually received by her master, or unless facts were disclosed from which actual knowledge must be inferred.

**6.** SAME—PRESUMPTIONS.

The mere fact that a vessel in her regular route touches at a port where notice of the blockade might have been received by cable is not sufficient to raise a presumption of actual knowledge by her master, when there is no proof and no good reason to suppose that news of the blockade had in fact been cabled to such port.

**7.** SAME—ADEQUACY OF BLOCKADE.

A vessel which enters a port after a blockade has been proclaimed is not to be condemned, when there is no evidence of the presence of any adequate force to maintain the blockade until some time after her departure.

8. SAME—ADDITIONAL EVIDENCE.
    Although the evidence in preparatorio renders it highly improbable that the vessel was attempting to break the blockade, yet the court will permit the taking of additional evidence, on depositions from officers of the captor stating positively that she was attempting to enter the port at the time she was overhauled.

This was a proceeding instituted by the United States against the steamship Olinde-Rodrigues to procure her condemnation as prize of war for attempting to break the blockade of the port of San Juan, Porto Rico.

Rafael R. Govin and E. K. Jones, for claimant.
Edward W. Hughes, Asst. U. S. Atty.

BRAWLEY, District Judge. Condemnation of the Olinde-Rodrigues is demanded on two grounds: (1) The entry into the blockaded port of San Juan, Porto Rico, on July 4, 1898, and departure therefrom on July 5th; (2) the attempt to enter the same port on July 17th. The cause is before me on the testimony taken by the prize commissioners in preparatorio, and by the practice of this court such testimony only is admissible upon this hearing. Certain depositions of officers and men from the United States cruiser New Orleans, taken de bene esse, were presented; but, the supreme court of the United States having decided in The Sir William Peel, 5 Wall. 534, that "in cases of prize no evidence is admissible on the first hearing except that which comes from the ship, either in the papers or the testimony of persons found on board," these depositions cannot now be considered. The evidence in preparatorio is confined to the depositions of officers, crew, and passengers of the captured ship, taken in reply to certain standing interrogatories, and the papers and documents found aboard. This practice, which prevails in England and in this country, and which had its beginnings in the civil law, generally suffices to determine whether the captured vessel is or is not the property of an enemy. In the earlier years this was the chief function of prize courts, but this method of procedure is ill adapted to the ascertainment of the truth in cases of capture for attempts to enter blockaded ports, which, since the invention of steam power, is of such frequent occurrence that it may be almost said to have become a business; for vessels engaging therein rarely carry among their papers condemnatory evidence of their guilt, and their officers cannot be expected to admit the illegality of their calling. A searching examination and cross-examination, not permissible under the present practice, and, especially the examination of witnesses from the capturing vessel, can alone enable the court to reach a final conclusion as to the truth of the charges preferred.

In this hearing, limited as it must be to the testimony coming from the captured ship, the incriminatory averments will be considered each in its order; and, first, as to the entry into the Port of San Juan on July 4th. The Olinde-Rodrigues is a large and valuable steamship belonging to the Compagnie Generale Transatlantique, a French corporation. She receives a subsidy from the French government, and carries its mail upon a regular itinerary prescribed by its

postal establishment. She sailed from Havre on June 16, 1898, with a crew of 85 men, touching at Pauillac, France, leaving that port on June 19th, and arrived at St. Thomas on July 3d. Thence her regular course was to San Juan, Porto Plata, Cape Haytien, St. Marque, Port au Prince, Gonaise, and to return by the same ports, the voyage terminating at Havre, France. That the sailing for a blockaded port with knowledge of the blockade is a breach of the blockade, and subjects the ship to condemnation, is well-settled law. The Vrow Johanna, 2 C. Rob. Adm. 109, and The Neptunus, Id. 110, are cited to sustain the proposition. In The Neptunus, a vessel sailing from Dantzic, October 26, 1798, was captured in attempting to enter the port of Havre on November 26th. Notification of the blockade had been made February 23d. Sir William Scott held that a master of a vessel cannot be heard to aver against a notification of a blockade that he is ignorant of it; that notification to any foreign government would clearly be to include all the individuals of that nation, it being the duty of the government to communicate the information to its citizens. The sailing of the Neptunus for the blockaded port eight months after the notification subjected her to confiscation, but it appeared from the testimony that while on the way to Havre she fell in with Admiral Duncan's fleet, was examined and liberated by the captain of a frigate, who, on being asked whether Havre was under a blockade, said "it was not blockaded." This captain was mistaken, but, the information having been given and accepted in good faith, this great judge said that it would be pressing "a pretty strong principle rather too strongly" if he looked retrospectively to the state of mind in which the master stood before the meeting with the British fleet; and the Neptunus was discharged.

There being no denial of the sailing into San Juan, two inquiries must be affirmatively answered before condemnation would follow. The first is whether the port was in fact blockaded, and the second is whether the Olinde-Rodrigues had notice thereof. They may be conveniently considered together. Two proclamations of the president of the United States have a bearing on the subject. The first, dated April 26, 1898, declares adherence to the rules of the Declaration of Paris, among which are adopted the following: "Blockade, in order to be binding, must be effective." The second proclamation, bearing date June 27, 1898, declares that the United States "has instituted and will maintain an effective blockade" of certain ports in the Island of Cuba, which had not been included in the proclamation of June 22d, and "also of the port of San Juan, in the Island of Porto Rico." The declared object of the war with Spain was to expel that sovereignty from its domination in the Island of Cuba, and to enable the inhabitants thereof to establish a free and stable government, the intention to acquire new territory being expressly disavowed, and the conquest of the Island of Porto Rico does not appear to have been within the contemplation of the congress which declared the war. It is a matter of current history that early in May the fleet of Admiral Sampson, which had been engaged in blockading certain Cuban ports, sailed for the Island of Porto Rico for the purpose of intercepting the Spanish fleet commanded by Admiral Cervera, which had sailed from the Cape

de Verde Islands shortly before, destined, it was supposed, to relieve the blockaded ports in Cuba. Admiral Sampson, after remaining for some days in the waters near Porto Rico, not finding the object of his search, on May 12th bombarded for a few hours the fortifications defending the entrance to the harbor of San Juan. This bombardment does not seem to have been seriously intended to reduce and capture the town of San Juan, and, beyond trying the range of his guns, was without result. Shortly thereafter his fleet returned to the Cuban waters, and it was not until after June 27th that this government proclaimed its intention to institute a blockade of the port of San Juan. This proclamation was made while the Olinde-Rodrigues was at sea. It is true that one of the witnesses, whose deposition is before the court, testifies that he had heard before leaving Havre of the blockade of San Juan. This was Robert Raab, the pastry cook, the product of whose art not uncommonly conduces to lively and disordered fancies. The common-law rules of evidence have no place in prize cases. They are essentially of the lex juris civilis, and hearsay and belief may be accepted as testimony, and in a proper case information which was so widely circulated in a community as to reach the pastry cooks would be considered to have become the common stock of knowledge, of which no man could plead ignorance; but, to use words already quoted, it would be pressing "a pretty strong principle rather too strongly" to thus affect the master of the Olinde-Rodrigues with knowledge of a fact nonexistent. It is not unlawful for neutrals to trade with the enemy, and, a blockade not being a necessary consequence of a state of war, it is not to be assumed that a neutral possesses any knowledge of its existence until the fact of its establishment is in some way brought home to him. There is no universally accepted doctrine as to what constitutes due notification. The French—and therein the continental jurists are in general accord with them—hold that there must be notice from the government instituting the blockade, and also notice from a vessel at or near the blockaded port, that the blockade has in fact been established, and it is so provided in most of their treaties; while the theory generally accepted in England and the United States is that notification at the port of blockade should only be required when there has not been sufficient time for neutral ships at sea or in distant ports to become aware of its existence, and that a rule requiring notification at the port of blockade offers opportunity and increases the temptation to engage in such enterprises. There is no formal code of international law, and no tribunal to denounce penalties and punishments for its violation. It has its sanction and derives its force from the general consent of civilized nations, and from the wholesome influence of their enlightened public opinion, which insensibly, in the progress of time, has evolved certain principles and usages, consonant with sound reason, which the tribunals of each nation enforce, moved by the collective and constraining will of the whole body of civilized states.

No machinery is provided by which one state can enforce conformity by another state to any rules which nations in general have not embodied in laws recognized by them. Until those halcyon days, now predicted, arrive, when the great Anglo-Saxon nations by their

union and co-operation dominate and become the accepted light of the world, this, with other like questions, must await solution. The exigencies of this case do not demand any precise determination of what constituted due notice of a blockade. All agree that mere suspicion is not enough; that there must be knowledge, or knowable facts from which knowledge must be inferred. The Olinde-Rodrigues being at sea when the proclamation was issued, her master cannot be affected by any notice given to his government in his absence. Under the usage of all nations, and in common reason and fairness, which precede and give sanction to all law, she had the right to proceed upon her regular route until her arrival at San Juan, unless notice of the blockade was actually received by her master, or unless facts were disclosed from which actual knowledge must be inferred. It is strenuously urged by the attorney for the United States that he could, and probably did, obtain such notice at St. Thomas. There is no credible testimony going to show such knowledge. It is true that one witness says that he heard of the blockade when there, but, as he had heard of it before leaving Havre, and before it existed, no credence can be given to such testimony. It is but fair to say of this witness that, as his testimony was given through an interpreter, he may have confounded the bombardment of the 12th of May with the blockade subsequently proclaimed. St. Thomas is a small port belonging to Denmark, of little commercial importance. The president's proclamation, first published in this country on June 28th, could not probably have reached there by mail, and there is neither probability nor proof that it was sent by cable. The court is asked to infer, in the absence of any testimony to the point, that because it might have reached there through the cable, and might have become generally disseminated, the master of the ship must be presumed to have had knowledge of it, and condemnation is asked upon bare suspicion of possible knowledge of a fact not known to exist. That there may have been rumors and expectation that the port of San Juan would be blockaded is probable. The bombardment six weeks before may naturally have awakened such expectation, and the master did what a prudent man with grave responsibility should have done, although no law required it to be done. He made inquiry, through the cable, of his consul at San Juan, and received the reply that there had been "no official notification of the blockade. Believe that packet ships should follow their regular routes. They do not run any danger." Much stress was laid upon the words "official" notice in this reply, and the court is asked to infer that there may have been notice, though not official. It is true that notice, to be binding, need not be official notice, but it is clearly a non sequitur to hold that because he says he has had no official notice it is therefore to be implied that he had other notice. It is natural that an official to whom an inquiry is addressed as an official should reply officially; and, when he added the expression of his opinion that the ship could follow her regular route with safety, this negatives the idea that he had any knowledge that would awaken the apprehension of any hazard in her so doing. It was under these circumstances that he sailed from St. Thomas upon his

usual route to San Juan. Carrying the mails, it was his duty to go there, unless forbidden by some paramount authority; and he would have been derelict in that duty if he had been diverted from his course by mere rumors. If he had found the port blockaded upon his arrival at San Juan, his previous want of knowledge would not have justified an attempt to enter, but, so far as the testimony shows, there was no actual blockade of that port prior to July 4th, and he entered without receiving any warning or meeting any hindrance. By the terms of the president's proclamation, the Declaration of Paris, which was directed against mere "paper blockades,"—that is, blockades not sustained by actual force, or sustained by a notoriously inadequate force, —was adopted, and he declared that "blockade, in order to be binding, must be effective." There is no precise definition of what constitutes an effective blockade, but the instructions issued by the secretary of the navy June 20, 1898, explain with sufficient clearness the duty of blockading vessels in this respect, and are intended for their guidance. "A blockade," says this general order No. 492, "to be effective and binding, must be maintained by a force sufficient to render ingress to or egress from the port dangerous." So we have from the highest authority in this country a distinct repudiation of the doctrine that a mere proclamation of an intention to blockade a port, without sending thither an adequate force, is of any validity whatever. There is a provision in this circular that where blockading vessels are driven away by stress of weather, but return without delay to their stations, the continuity of the blockade is not to be considered to be thereby broken. There is no evidence that any blockading vessels previously stationed to guard the entrance were temporarily absent through stress of weather on the day when the Olinde-Rodrigues made her entrance into the port, but distinct grounds for inferring the contrary, because, when she went out on her usual course the day following, she was overhauled by the United •States cruiser Yosemite, and boarded by an officer, who entered upon the log the notice of the blockade in pursuance of the general order above referred to. Commander Emory of the Yosemite is an officer of uncommon ability and accomplishments. He doubtless had a copy of these instructions, and, probably familiar with the law embodied therein, he would have seized the ship if he had found that she had taken advantage of his temporary absence, caused by stress of weather, to break the blockade. His omission to do so, with other circumstances, makes it highly probable that the blockade proclaimed on June 27th was not made effective until July 5th, when the Yosemite arrived. If there was any evidence of fraudulent omission to take notice of what was proved to be a subject of general notoriety; if the proclamation of the president had had reasonable time to circulate, and to affect with knowledge citizens of the country where it was published; or if there was any proof of actual knowledge, however acquired,—this would have imposed the duty of observance. But the president's proclamation does not, proprio vigore, bind a party who is ignorant of it; and, being of no effect unless followed by a force adequate to support it, and there being no evidence of the presence of any

such force prior to July 5th, this court could not pass sentence of condemnation on the first charge without a violation of the law of nations and of every principle of justice.

The testimony relating to the second charge—the attempt to enter the port of San Juan on July 17th—will now be considered. There is no question here as to notice of the blockade, for on July 5th due notice was entered upon the log. The testimony of the master is that, after completing his prescribed itinerary, and on his return voyage, he sailed from Porto Plata at 6 o'clock on the morning of July 16th; that at 8:20 in the morning of July 17th he was passing the port of San Juan, about seven or eight miles eastward of the port, and about nine miles from the shore; that upon seeing the United States cruiser New Orleans he turned his ship towards her; that one gun was fired across his bow; that he was boarded by Lieut. Russell, an officer of the New Orleans, who examined his papers; that, upon being informed that his vessel would be seized, he sent a letter to the commander of the New Orleans, protesting against the seizure; that he had no intention of entering the port of San Juan, and had already passed the entrance when his ship was stopped; that on the outward voyage at each port he had warned the agent of his company and the postal department that he would not touch at Porto Rico on the return, nor take passengers for that port; that at Cape Haytien he had received a telegram from his agent at San Juan informing him that there would be 50 first-class passengers there for him, and that he had cabled him immediately that he would not touch at San Juan, but would be at St. Thomas on the 17th. The testimony of the other officers of the ship is in substantial accord with the above. The purser and the head steward say that special instructions were given at Porto Plata not to receive any tickets for Porto Rico. August Julien, a passenger, is the only witness whose testimony suggests a doubt as to the truth of these statements. He says "that his personal opinion is that the vessel would have entered San Juan if they had been able to do so. His personal opinion is that they would have run the blockade if they could have done so without danger of being captured. His first reason for that belief is that the captain had made a boast of having forced the blockade once before, knowing that the place was blockaded, but stated as his grounds for doing so that he had no official notification, but he knew it; and his second reason is that they could never get an answer—definite answer—as to where they were going, and when leaving Porto Plata they generally state where the destination is, but at this time nothing was posted as to the destination." He also repeats some rumors that he heard aboard that there was irregular merchandise for Porto Rico. This witness is a British subject, a native of Mauritius, of African descent, and is preparing for the priesthood. An incident which came to my notice before his examination caused me to doubt whether any statement of his could be accepted as absolute verity, and subsequently I have had reason to believe that his testimony is entitled to little consideration. Leaving it out, there is nothing in the testimony in preparatorio that furnishes any ground whatsoever for condemning the ship; but, as has

been stated before, it can rarely happen that a charge of an attempt to break a blockade can be supported by testimony of the ship's officers and crew; and without some testimony from the capturing vessel it would be hardly possible in any case to pass a sentence of condemnation. All the circumstances of this case render it highly improbable that there was an attempt to break the blockade. The ship is a large and valuable one, belonging to one of the great steamship companies of the world. That she would run the risk of confiscation for the precarious profits of such a venture is scarcely credible. Ships of this class are not likely to engage in that kind of business. She was on her return voyage, laden with tobacco, sugar, coffee, and other products of that region, for which no market would probably be found in Porto Rico. She had left San Juan only 12 days before, and the profit to be gained by a return was so incommensurate with the risk encountered that it would require an overwhelming weight of evidence to countervail the positive testimony of her officers that they had no intention of entering that port. An order for the discharge of the ship would be made without hesitation but for the motion of the district attorney for leave to take further proofs. This motion is supported by the depositions de bene esse of Lieut. Russell and others, from the capturing ship, taken before the prize commissioners. Considered as affidavits, they make a case against the Olinde-Rodrigues not to be lightly dismissed. They swear positively that she was attempting to enter the port of San Juan when she was overhauled by the New Orleans. To refuse the motion might seem to imply a belief that the capture was due to superserviceable zeal or to speculative cupidity. There is no ground for such imputation. There is one aspect of this case which suggests a motive for an attempt to enter, which is entitled to consideration, and concerning which some testimony might be obtained now which has not heretofore been available. After the destruction of Admiral Cervera's fleet and the surrender of Santiago, it became highly probable that San Juan would be invested by sea and land, and therefore probable that the wealthy inhabitants of that city would attempt to escape therefrom; and, in order to avoid the horrors of a siege, they might have offered such a sum for transportation as would have tempted the master of the Olinde-Rodrigues from the line of prudence which had theretofore marked his conduct.

Feeling that the government is entitled to an opportunity of making its case, if, after full consideration of its responsibility, it is advised so to do, I will make an order allowing further proofs. An order may also be entered discharging the vessel upon stipulation for her value, should the claimant so elect.