## THE OLINDE RODRIGUES.

(District Court, D. South Carolina. December 23, 1898.)

1. PRIZE—EFFECTIVENESS OF BLOCKADE.
    The fact of a capture by a blockading vessel does not determine the effectiveness of the blockade.

2. SAME—EVIDENCE—MOTIVE.
    Where the intention of the master of a captured vessel to enter a blockaded port is clearly proved, a motive therefor need not be shown, nor is affirmative evidence of want of motive material.

3. SAME—POWERS OF MASTER.
    The acts of the master of a vessel in relation to an attempt to enter a blockaded port are binding on the owner, any abuse of trust on the part of the master being a matter to be settled between them.

4. SAME—EFFECTIVENESS OF BLOCKADE—REQUIREMENTS.
    To constitute an effective blockade of an enemy's port, it must be maintained by a sufficient number of vessels, and by vessels of such a character as to render the danger to a vessel attempting to enter evident and manifest.

5. SAME—FACTS CONSIDERED.
    The Olinde Rodrigues, a French steamship having a regular route and carrying the French mails, one of the points on such route being the port of San Juan, Puerto Rico, was warned on leaving that port on the outward voyage of its blockade by the United States. In passing it in the usual course of the return voyage, but without any intention of entering, the Rodrigues saw but a single blockading vessel, which was 15 miles from the port, and was the only one on the station, and attempted to enter the port, but was captured. Held, that there was not an effective blockade of the port, within the spirit and intent of the law of nations, and that the captured vessel was not lawful prize.

This was a proceeding by the United States for the condemnation of the steamship Olinde Rodrigues as prize of war for attempting to evade the blockade of the port of San Juan, Puerto Rico.

Abial Lathrop, U. S. Atty., and B. A. Hagood, Asst. U. S. Atty.
J. P. K. Bryan, for captors.
Eustis, Jones & Govin, for claimant.

BRAWLEY, District Judge.    The French steamship Olinde Rodrigues, a merchant vessel of 1,675 tons, commanded by Maurice Pherivong, and belonging to the Compagnie Générale Transatlantique, is engaged in the West India trade, and receives a subsidy from the French government for carrying its mails upon an itinerary prescribed by its postal establishment.    Her regular course is from Havre, France, to St. Thomas, San Juan, Puerto Plata, Cape Haytien, St. Marque, Port au Prince, Gonaise, and to return by the same ports to Havre.    She sailed from Havre on June 16, 1898, arrived at St. Thomas July 3d, and at San Juan, Puerto Rico, on the morning of July 5th.    Commander Emory, commanding the United States cruiser Yosemite, formerly the merchant vessel El Sud, on duty in those waters blockading the port of San Juan, was on that morning lying to the westward of Sabinas point, which is about three miles southward and westward of San Juan, when he sighted the Olinde Rodrigues coming end on from the eastward towards the port of San Juan.    He immediately made chase at full speed (about 16 knots an hour), but before reaching her she had turned in, and was under the protection of the shore batteries, which extend for about three miles to the eastward of that port.    He lay outside beyond the range of the guns of the Morro until the next morning, when he intercepted the Olinde Rodrigues as she came out, and sent an officer aboard, who made this entry in her log: "Warned off San Juan July 5th, 1898, by U. S. S. Yosemite, Commander Emory," signed, "John Burns, Ensign U. S. N." Pherivong, the master of the Olinde Rodrigues, whose testimony was taken in preparatorio in proceeding for condemnation on a capture July 17th, charged with attempting to enter the port of San Juan on that day, testified that when he entered on July 4th he had no knowledge that the port was blockaded, and that he first heard of it from the Yosemite on July 5th, when he was leaving San Juan; that "they had no conversation because they could not understand one another, and therefore no conversation passed between them.    He signified to him not to return to San Juan; that there would be six war vessels there." After this notification he continued his voyage on the itinerary above mentioned, arriving at Gonaise, her last port outward, on July 12th.    On his return voyage he stopped at the same ports, taking on freight, passengers, and mails for Havre.    At Cape Haytien, on July 14th, he received a telegram from the agent of his company at San Juan, telling him to hasten his arrival there by one day, in order that he might take 50 first-class passengers, to which he replied that the "Olinde Rodrigues will not touch at San Juan; will be at St. Thomas on 17th." Pherivong further testified that on the outward voyage at each port he had warned the agent of the company and the postal department that he would not

touch at Puerto Rico, and that he would not take passengers for that point, and that the letters would be returned to St. Thomas; and that, having received his clearance papers at Puerto Plata at half past 5 o'clock on the evening of July 15th, he did not leave until 6 o'clock in the morning of July 16th, as he did not wish to find himself at night along the coast of Puerto Rico.　He was captured on the morning of July 17th, between 8 and 9 o'clock, off the port of San Juan, by the United States cruiser New Orleans, Capt. Folger, and sent as prize of war to the port of Charleston, where proceedings for condemnation were instituted.　The case was heard upon the testimony in preparatorio, and the court was of opinion, for reasons stated (89 Fed. 105), that there was not sufficient ground for condemnation; but upon motion of the district attorney, supported by affidavits of officers of the capturing vessel, an order allowing further proof was entered. To this order exception was taken by proctors for the claimant, but the court had no doubt then, and has none now, that such order is well supported by reason and authority.　Subsequently thereto, an order was entered for unloading the cargo, under the supervision of the prize commissioners; and as it consisted wholly of products of the West Indies, was not contraband of war, and was owned by neutrals, it has been released.　There has been considerable delay in the taking of the additional testimony, owing to the absence from the country of the chief witnesses, but all of the testimony in behalf of the captors is now in, and the case is before the court upon a motion to discharge the vessel, proctors for the claimant reserving the right to introduce testimony hereafter if the motion is denied.

Without passing upon the question whether, in a proceeding in admiralty, a party having an opportunity to offer testimony, failing to do so, may draw the opinion of the court upon his adversary's case, and thereafter be permitted to reply to it,—a question of practice which is at least doubtful, as counsel were duly warned,—the court is of opinion that there is one aspect of this case which may possibly be decisive of it, and upon which no further testimony can be had, and therefore it becomes its duty at this stage to consider the motion.　The case has been argued orally, and by permission of the court briefs have been submitted.　The last one, filed December 19th, contains some citations from books to which access cannot be had without delay, but, as it is not conceived that they would throw any material light upon the questions involved which has not been received from other quarters, the court feels that, greatly as it desires enlightenment, the interests of justice demand a speedy decision, and with the constant comfort and consolation which comes from the knowledge that its errors may be corrected by a more enlightened tribunal it will now dispose of the case.

In determining a question of this nature the character of the ship and of its owners and all acts done from the commencement of the voyage are proper subject of investigation.　The case differs from that of The Newfoundland (lately determined in this court; 89 Fed. 510), in that here the presence of the Olinde Rodrigues near the port of San Juan is not in any wise a suspicious circumstance.　She was rightly there, for this port lay upon her regular route.　The time of the occurrences likewise marks an essential difference.　Everything here occurred in

the bright light of a summer day. The character of the cargo is different; consisting wholly of the products of Puerto Rico and other West India islands, it is not even suggested that any of it was destined for that port; and there is a material difference in the character of the ship and of the owners. The ship is a large and valuable one, and she belongs to one of the largest steamship companies of the world, engaged in a regular business, and carrying the mails. In this respect the case is sui generis. Ordinarily, it is the owner or charterer of the vessel that, tempted by the large profits usually attending the venture, directs the enterprise which exposes his property to capture and confiscation; and, though the law vests in the master of the ship powers which bind the owner in respect to the conduct of the ship as much as if committed by the owner himself, a case will scarcely be found where a master, without authority of his owners, has undertaken such a perilous enterprise; and it is not contended here, and it is not conceivable, that there was any authority from the owners of the ship to attempt a breach of the blockade. The character of the parties is also a circumstance entitled to be considered in determining the nature of any transaction. This court has had occasion during the last few months to examine nearly all the cases reported during this century involving breaches of blockade, and it does not recall one where a vessel commanded by a Frenchman has been condemned for this offense. Such ventures do not accord with the spirit of the race, for while there is in the French character a certain ebullience which makes for instability in government, leading to tempestuous and recurrent seasons of disorder and delation, no people are so orderly and methodical in the ordinary transactions of life.

Sir William Scott in The Betsey, 1 C. Rob. Adm. 78, says: "On the question of blockade three things must be proved: First, the existence of an actual blockade; secondly, the knowledge of the party; and, thirdly, some act of violation, either by going in or by coming out with a cargo taken after the commencement of blockade."

The first point in order of time, and first in importance to be determined, is whether or not there was an actual blockade of the port of San Juan. The purpose of the war with Spain, as declared by the joint resolution of April 20, 1898, which led to it, was to relieve the "abhorrent conditions" which prevailed in the Island of Cuba, and to compel the government of Spain to relinquish its authority, and to withdraw its land and naval forces from that island; and there was an express disclaimer of any intention to exercise sovereignty, jurisdiction, or control over said island, except for the pacification thereof. The proclamation of the president of April 22d refers to this joint resolution, and declares a blockade of certain ports of the Island of Cuba for "carrying into effect said resolution." There was apparently no purpose at that time to undertake the conquest of the Island of Puerto Rico, and nothing that would indicate to neutral nations that the ordinary commerce with that island would be interfered with. The naval forces of the United States which appeared off San Juan in the month of May were sent for the purpose of intercepting the squadron of Admiral Cer-

vera, then supposed to be making its way to that port. That purpose failing, Admiral Sampson returned with his fleet to Cuban waters, and the United States cruiser St. Paul was left in the neighborhood of Puerto Rico. On June 27th another proclamation was issued, declaring the purpose of extending the blockade to certain other Cuban ports and to the port of San Juan. Capt. Sigsbee, commanding the St. Paul, was relieved by Commander Emory, commanding the United States cruiser Yosemite, on June 25th, and he in turn was relieved by Capt. Folger, commanding the United States cruiser New Orleans, on July 14th. From the time of the departure of Admiral Sampson, about the middle of May, to July 17th, only one ship of war was upon that station.

The proclamation of the president dated April 26th declared the adherence of this government to the rules of the Declaration of Paris, which, among others, provides that "blockades, in order to be binding, must be effective." The full text of this declaration, April 16, 1856, on this subject, is in these words: "Blockades, in order to be binding, must be effective; that is to say, maintained by a force sufficient really to prevent access to the coast of the enemy." This declaration promulgated no new principle of international law. The doctrine of paper blockades—that is to say, of blockades not sustained by any actual force or sustained by a notoriously inadequate force, which, early in the century, under the stress of the Napoleonic wars, had a certain limited prevalence—never had been accepted by the civilized states as a sound principle, and in formulating an incontestable rule it did not altogether solve the difficulty. As the precise question here is whether there was a blockade of San Juan, the court may find some assistance in etymology, which often aids to clear obscurities.

Dr. Johnson defines a blockade to be simply "to shut up by obstruction."

In the Imperial Dictionary it is thus defined:

"The shutting up of a place by surrounding it with hostile troops or ships, or by posting them at all the avenues to prevent escape and hinder supplies of provisions and ammunition from entering with a view to compel a surrender by hunger and want without regular attacks."

The New English (Oxford) Dictionary gives this definition:

"The shutting up of a place, blocking of a harbor, line of coast, frontier, etc., by hostile forces or ships, so as to stop ingress and egress, and prevent the entrance of provisions and ammunition, in order to compel a surrender from hunger or want, without a regular attack."

In the American Encyclopædic Dictionary a blockade is thus defined:

"The act of surrounding a town with a hostile army, or, if it be on the seacoast, of placing a hostile army around its landward side and ships of war in front of its sea defenses; so as, if possible, to prevent supplies of food and ammunition from entering it by land or water."

If the purpose of proclaiming the blockade of San Juan was to bring pressure upon its inhabitants, by preventing supplies of provisions or ammunition from entering, it is difficult to understand how there could be any reasonable expectation of accomplishing

such purpose, so long as the ports of Ponce and all the other ports of the island were left open, there being no land forces to intercept communication.

What constitutes an "effective" blockade cannot be defined with absolute and rigorous precision. Some nations have endeavored to define it by treaty. Prussia and Denmark, in 1818, stipulated that two vessels should be stationed before every blockaded port. An earlier treaty between Holland and the two Sicilies prescribed that at least six ships of war should be ranged at a distance slightly greater than gunshot from the entrance. A still earlier treaty between France and Denmark provided that the blockaded port should be closed by two vessels at least, or by a battery of guns on land. Among the continental nations the constant and uninterrupted presence of two or more vessels at the blockaded port is considered necessary, and we find in the instructions given to the French naval officers during the war with Germany in 1870: "Si les forces navales Françaises étaient obligées par une circonstance quelconque de s'eloigner du point bloqué les navires neutres recouvraient le droit de se rendre sur ce point;" and the blockade thus interrupted would have to be re-established and notified anew under the prescribed forms.

There are no decisions of controlling weight upon the exact point. Sir William Scott, whose rigorous enforcement of the law of prize did not escape the censure of his contemporaries and the criticism of after ages, says, in The Juffrow Maria Schroeder, 3 C. Rob. Adm. 128:

"A blockade may be more or less rigorous, either for the single purpose of watching the military operations of the enemy, and preventing the egress of their fleet, as at Cadiz, or on a more extended scale to cut off all access of neutral vessels to that interdicted place, which is strictly and properly a blockade, for the other is in truth no blockade at all, so far as neutrals are concerned. It is an undoubted right of belligerents to impose such a blockade though a severe right, and, as such, not to be extended by construction. It may operate as a grievance on neutrals, but it is one to which, by the law of nations, they are bound to submit. Being, however, a right of a severe nature, it is not to be aggravated by mere construction."

In The Mercurius, 1 C. Rob. Adm. 69, he says:

"For a blockade may exist without a public declaration, although a declaration unsupported by fact will not be sufficient to establish it."

In The Henrik & Maria, 1 C. Rob. Adm. 124, he says:

"The sight of one vessel would not, certainly, be sufficient notice of a blockade, and therefore it is necessary that it should be signified to me that there was a blockade de facto before that port."

In Vrouw Judith, 1 C. Rob. Adm. 151, he defines a blockade to be:

"A sort of circumvallation by which all correspondence and communication is as far as human force can effect it effectually cut off."

Mr. Marshall, secretary of state, in a letter to Mr. King, September 20, 1800 (2 Am. St. Papers, 488), says:

"Ports not effectually blockaded by a force capable of completely investing them have not yet been declared, by the law of nations, in a state of blockade."

In the same letter, referring to occasional absences of the fleet when blown off by a storm from its station, which it immediately resumes, he says:

"I am persuaded that when a part of the fleet is applied, though only for a time, to other objects, or comes into port, the very principle requiring an effective blockade—which is, that the mischief can only be co-extensive with the naval force of the belligerent—requires that during such temporary absence the commerce of neutrals to the place should be free."

Mr. Bayard, secretary of state, in his letter to Mr. Becerra, April 9, 1885, reviews much of the diplomatic correspondence of the United States government on this subject, and says:

"This government, following the received tenets of international law, does not admit that a decree of a sovereign government closing certain national ports in the possession of foreign enemies or of insurgents has any international effect unless sustained by a blockading force sufficient to practically close such ports,"

—And closes by referring to the course of this government at the beginning of this century, when, young in the family of sovereignties, at great cost of blood and treasure it undertook wars against Great Britain and France to maintain the freedom of the seas and the invalidity of paper blockades.

Mr. Madison, secretary of state, in his letter of October 27, 1803, says that:

"The law of nations requires, to constitute a blockade, that there should be the presence and position of a force rendering access to the prohibited place manifestly difficult and dangerous."

Mr. Monroe, secretary of state, in his letter to Mr. De Onis, March 20, 1816, says:

"The force should be stationary, and not a cruising squadron, and placed so near the entrance of the harbor or mouth of the river as to make it evidently dangerous for a vessel to enter."

Sir Roundell Palmer, solicitor general, in a speech in the house of commons, March 7, 1862, discussing the sufficiency of a blockade, says:

"You cannot, a priori, lay down what particular number of frigates or other ships of war shall be an adequate force in any hypothetical case. The improvements in modern warfare, the introduction of steam, or any other similar change, may have made sufficient or insufficient now means of blockade which were not so before. What, from the beginning of this century, has been laid down as the test in this matter? Why, in the first place, that of evident danger."

The above is a fair epitome of the opinion of statesmen. Next will be considered the views of text writers.

Mr. Hall, the latest writer on International Law, says (Oxford Ed. 1895) p. 726:

"It is impossible to fix with any accuracy the amount of danger in entry which is necessary to preserve the validity of a blockade. It is for the prize courts of the belligerent country to decide whether, in a given instance, a vessel captured for its breach had reason to suppose it to be nonexistent."

Woolsey, Int. Law, p. 315, says:

"A valid or lawful blockade requires the actual presence of a sufficient force of the enemy's vessels before a certain place on the coast. * * * What a sufficient force is cannot be determined with logical rigor. It may be said to be such a force as will involve a vessel attempting to pass the line of blockade in considerable danger of being taken. * * * It results from this that all paper or cabinet blockades, whether declarations of an intention to blockade a place without sending an adequate force thither, * * * are an undue stretch of belligerent rights, and of no validity whatever."

Manning, Law Nat. (London, 1875) p. 403:

"The rule is explicit that the actual existence of blockade is necessary to involve the penalties of breach of blockade. A declaration of blockade, unaccompanied by the fact of blockade, does not establish a blockade. It was so determined by our lords of appeal in the war with Napoleon I. Admiral Jervis declared the West India Islands in a state of blockade, but the lords held that, as the fact did not support the declaration, a blockade could not be deemed légally to exist."

Heffter, § 155, holds that:

"Vessels should be permanently stationed, and in sufficiently great number, to prevent every kind of communication with the port or place invested."

Ortolan II. 328, thinks that there should be "permanent naval forces."

Hautefenille says "that there should be before the port a number of ships of war sufficient to command the approaches to it by their artillery."

Pistoye & Duverdy, I. 365, say that "the place should be invested by forces sufficient to render the entry to it perilous to the ships which might wish to enter there."

The rule adopted by the Institut de Droit International, Paris, 1883, Ann. De l'Institut, p. 218, is that the blockade is to be considered effective "lorsqu'il existe un danger imminente pour l'entrée ou la sortie du port bloqué à cause d'un nombre suffisant de navires de guerre stationnés ou ne s'ecartant que momentanément de leur station."

Mr. Hall says that "the effect of the suggested rules would approach very nearly to the English practice."

Bluntschli, a writer of very high authority (Mod. Int. Law, § 829), says: "A port is understood to be actually blockaded when ingress to and egress from it are prevented by vessels of war stationed off it, or by the land batteries of the blockading power."

It appears from this review of the writers and publicists that there is a general agreement among them that a blockade, to be effective, must be maintained by a number of vessels; that the danger of entry into the blockaded port must be evident and manifest. The words used to designate the blockading force are always "ships of war," "fleet," or "squadron." The peril to be encountered is always designated by such words as "manifestly," "evidently," "obviously." They all speak of the "line of blockade." It is claimed, and it is obviously true, that a vessel of the speed and armament of the New Orleans is more effective than a fleet of frigates of the olden time, but it is also true that the facilities for eluding blockades are enhanced by the same steam power which enables those who wish to violate the law of blockade to keep pace with those whose duty it is to enforce it. During the late war between the states, the fact that a number of vessels succeeded in running the blockade at the port of Charleston led to some correspondence between Lord Russell and Mr. Seward as to the effectiveness of the blockade, but, upon its appearing that the blockade here was usually maintained by several ships of war, one of which lay off the bar between the two principal channels of entrance, while two or three cruised outside within signaling distance, the re-

monstrance was withdrawn. Bernard, cc. 10, 12, "Neutrality of Great Britain." Only two direct authorities have been cited as to the effectiveness of a blockade by one ship: The Arthur, 1 Dod. 425, in which Sir William Scott is reported as holding that a blockade was not effectual when it was attempted to be maintained by a single ship, and that, to be effectual, a blockade must be maintained "by stationing a number of ships, and forming, as it were, an arch of circumvallation round the mouth of the prohibited port. Then, if the arch fails in any one part, the blockade fails altogether." This volume is not in the library of the court, and the case has not been examined by it. The case of The Hallie Jackson, 11 Fed. Cas. p. 290, is cited to support the proposition: "That there was in fact an effective blockade established at the port on the arrival of the brig is demonstrated by her arrest there." The facts, as reported, do not show whether there were one or more vessels blockading the port of Savannah when the vessel was captured. The grounds of condemnation are: First. That the vessel was enemy's property at the time of the seizure; secondly, because the vessel willfully attempted to violate the blockade of the port of Savannah, with knowledge that such blockade existed,—the court holding that a "neutral merchant becomes a participator with the enemy in any undertaking or device to violate a blockade, and his property is thereby made to share a common fate with the enemy's itself." It is probably such opinions as this that led Mr. Hall, a writer of very high authority, to say (Int. Law [4th Ed.] p. 735): "During the American Civil War the courts of the United States strained and denaturalized the principles of English blockade law to cover doctrines of unfortunate violence." Whatever may be the true test of the effectiveness of a blockade, the fact that an isolated capture has been made cannot be accepted as the true test, for, if so, the converse would follow, and the failure to capture would demonstrate its ineffectiveness. The learned proctor for the captors has forcibly argued that within less than three minutes the Olinde Rodrigues would have been under the guns of the batteries, and would have escaped capture. The testimony shows that on July 4th she actually did evade the efforts of the Yosemite to overhaul her. Can it be contended that the effectiveness of a blockade is to be determined by such accidents or incidents as these? Mr. Madison, secretary of state, in a letter to Mr. C. C. Pinckney, October 25, 1801, says that "mere liability by neutral vessels to capture by belligerent cruisers hovering around a coast cannot constitute a blockade of a port on such coast." If the fact of capture is the test of effectiveness, then every capture under a notified blockade would be legal, because the capture itself would be proof of the existence of a blockading force,—a proposition which finds no support in reason or authority. Its acceptance would nullify the very principle upon which rests the accepted doctrine requiring blockades to be effective, which is that the mischief to neutrals incident to all blockades, however their rigors may be softened, shall only be co-extensive with the naval forces of the belligerent which seeks to enforce them. So long as war is unavoidable,—and the indications of any change in human nature calculated to prevent it are feeble, if not deceptive,—the efforts of all civilized countries

is to contract, as far as possible, the range of its mischiefs, and to mitigate the pressure which hostilities inevitably produce upon the commerce of neutrals. States have the right to go to war with each other, with or without reasonable cause; but the rest of mankind which desires to be at peace is entitled to be protected as far as possible from the inconvenience and injury which must necessarily result from it. Neutrals have the right to carry on commerce with either belligerent, and the interruption of that commerce is an act of force only justified by some necessity, real or imagined, which force must be exercised in the manner sanctioned by the law of nations. While that law recognizes the right of blockade, it insists that the blockade shall be a real one, for, although a real blockade which shuts up a port may be a great hardship, and the more impassable the barrier the greater the hardship, yet a real blockade has limits. It cannot range over an indefinite expanse, and it certainly would be limited by the naval power of the belligerent which proclaims it. If Admiral Sampson's fleet had, by some great calamity, been engulfed, and Admiral Cervera's four swift cruisers had undertaken, under a proclamation of Spain, the blockade of four of our Atlantic ports, each of them, cruising near the entrance of a separate port, would doubtless have made captures, probably many of them. Would such captures have been proof that the blockades were effective?

Certain pregnant facts are substantially undisputed, and certain conclusions are indisputable: (1) That the town of San Juan was not under siege on July 17th. The abortive bombardment of May 12th by Admiral Sampson's fleet cannot be considered as an investment of that place, and, its reduction and the conquest of the island of Puerto Rico not being one of the declared objects of the war with Spain, there was nothing to affect neutrals with notice that intercourse would be interfered with prior to the president's proclamation of June 27th; and, as this proclamation related only to one port, it could not be inferred that it was the settled purpose of this government to put an end to all communication with that island. (2) That the cruiser St. Paul, a vessel of great speed, had been upon that station long before the proclamation of the blockade, and, though not comparable in armament with the New Orleans, she was equally efficient for blockading purposes, and the Yosemite was but little less so; from which it is fairly deducible that the proclamation of the blockade did not induce the sending thither of any force to make it effective, and that the single cruiser upon that station, from a date long anterior to the proclamation, had other duties, and was intended for other purposes, than merely to maintain a blockade. (3) That the Olinde Rodrigues arrived off the port in the daytime; that she had no cargo, passengers, or mail for San Juan; that there was nothing in her cargo which, if landed, would have found a market there, or contributed in any way to the aid of the enemy; that, all of the other ports of the island being open, escape through such ports would have been attended with less risk than from San Juan; that she could have readily reached that port under the cover of darkness; that no incriminating evidence was found aboard the ship in the shape of instructions to her master which indicated preparations for a breach of the blockade, from which the con-

clusion·follows that any such attempt was the unadvised rashness of an individual, and not an instructed and premeditated act. (4) That there is no presumption that a respectable and responsible steamship company would intrust the control of a large and valuable steamship, and of its cargo, to a master likely to be guilty of the folly or fault, ignorance or perverseness, of attempting to break through the line of an actual and visible blockade in broad daylight, on a slow ship, involving the peril of its confiscation and the loss of his employment. That all of the facts above stated create a strong presumption in favor of innocence cannot be questioned, but it is equally true that presumptions cannot be indulged in when directly contradicted by facts; that the motive which leads to the commission of an offense need not be proved when the intention to commit it is clearly established; and, if it is conclusively shown that the conduct of the party leaves no doubt of his intention, he cannot be acquitted because of lack of apparent or sufficient motive. It is also a well-established principle of maritime law that, as between master and owner, any abuse of trust is to be settled between them; that the master is clothed with an authority which binds the owner; that any act committed by him in respect to the conduct of the ship is to be considered as the act of the owner, and it would be no defense against the penal consequences of an act to show that it was due to the folly of the master.

The court has now to determine the vital question whether this ship is to be condemned for its conduct on the morning of July 17th. That perpetual temptation which assails the virtue of mankind affecting its testimony by considerations of interest, prejudice, loyalty, or zeal is nowhere more potent than among those "who go down to the sea in ships;" and, as is not unusual, there is a direct conflict in the evidence. If it were essential to the decision of the case, the court would have no great difficulty in reaching a conclusion as to the preponderance of the testimony which is now before it, but, as it will be decided on other grounds, which, if not sustained, may require a re-examination of the whole case, and additional testimony may perhaps be offered, it is not considered either proper or necessary to express any opinion upon that point. The court is clearly of opinion that when the Olinde Rodrigues sailed from Puerto Plata on the 16th of July there was no premeditated purpose to enter the port of San Juan. There is not a scintilla of testimony from which such purpose can be inferred except the possession of a bill of health for San Juan. The failure to turn over this bill of health to the prize officer and its subsequent destruction was an act of great impropriety, and is made the subject of severe criticism on the part of the proctor for the captors. The spoliation of papers is always a circumstance of grave suspicion. It almost irresistibly compels belief of guilty intention, and the universal rule is to presume the worst against one guilty of it; but, with the explanation given, the court cannot say that, standing alone as an incriminating circumstance, it countervails all the other facts and presumptions in favor of innocence. It is to be remembered that Pherivong testifies that when he left San Juan on July 5th he had reason to believe that the blockading force there would be largely increased, and this, with the circumstances already detailed, and the absence of all other in-

criminating circumstances, leads irresistibly to the conclusion that he had no intention of breaking the blockade at the inception of his voyage. When he arrived off the port of San Juan on the morning of July 17th, on his regular route to St. Thomas, what does he find? Is there a "line of blockade" making it "manifestly" dangerous to enter? Is there a blockading fleet? Are there a number of vessels sufficiently near to each other to make it probable that an attempt to enter would be perilous? Is there an arch of circumvallation around the port? Some or all of these conditions must exist to make a blockade effective, and none of them are found. A single cruiser, which, as appears from her log, was 15 miles to the north and east of the Morro, was the only ship of war upon that station; a ship of no great size, but of powerful armament, and of great speed. Is a neutral vessel, which prima facie has the right of access to a port where for years she had been engaged in peaceful commerce, to be confiscated if, through an error of judgment, her master concluded that there was no effective blockade, and attempted to go into the port? Under the law of prize the question of the effectiveness of a blockade cannot be left to the shifting judgments of those who, on one pretext or another, may seek to evade it; and condemnation must follow if it is decided that the blockade was effective. A blockade, in its true and primitive acceptation, had nothing to do with confiscation of property. This practice had its birth in a barbarous and unenlightened age, which clothed the courts of the captor's own country with invidious powers that would be better exercised by the independent tribunals of a disinterested state. Such a penalty, harsh to the verge of ferocity, should never be imposed in any doubtful case. It would be a degradation to an honorable service, which requires no such stimulus to the performance of duty, if the courts of their country should strain the law for the purpose of rewarding the captors with the spoil of neutrals. Being of opinion that there was not an "effective blockade" of the port of San Juan within the spirit and intent of the law of nations, and that there would have been no attempt to enter if such blockade had existed, an order will be entered for the discharge of the vessel.